Scott Dwayne YOUNG, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–89–01374–CR.

Court of Appeals of Texas, Dallas.

Aug. 16, 1991.

Edward Gray, Dallas, for appellant.

Anne Wetherholt, Dallas, for appellee.

Before WHITHAM, LAGARDE and KINKEADE, JJ.

### OPINION

LAGARDE, Justice.

Following Scott Dwayne Young's jury conviction for murder, the trial court assessed his punishment at life. On appeal, Young raises three points of error, all complaining that the trial court erred in admitting, before the jury, his written statement. He contends that his statement was inadmissible because it: (1) violated his Sixth Amendment right to counsel; (2) was obtained under false pretext and in violation of his Fifth Amendment right against self-incrimination; and (3) had been "massive-

1. The trial judge who reviewed the record and signed the findings and conclusions after abatement was not the judge who tried the case and admitted the statement into evidence at trial.

2. It appears Young had two aggravated assault charges, one under the name Mark Johnson and one under the name Scott Young, that were no-billed on January 20, 1989.

ly" edited by the State. For reasons that follow, we conclude that the trial court erred in admitting Young's statement; however, because we further conclude that the error was harmless beyond a reasonable doubt, we affirm.

### Facts Relevant to Points of Error

#### a. The Suppression Hearing

Pursuant to article 38.22 of the code of criminal procedure and *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the trial court conducted a hearing outside the jury's presence on Young's oral motion to suppress, after which it admitted the written statement. The trial court[1] filed its written findings of fact and conclusions of law after this Court abated the appeal and ordered it be done. *See* TEX. CODE CRIM.PROC.ANN. art. 38.22 (Vernon 1979 & Supp.1991); *McKittrick v. State*, 535 S.W.2d 873, 875 (Tex.Crim.App.1976).

The evidence at the suppression hearing revealed that the deceased was killed on or about June 29, 1988, and appellant, under the name Scott Dwayne Young, was indicted for his murder on December 7, 1988. On December 22, 1988, Young was arrested on an unrelated aggravated assault charge. The Dallas County government offices were officially closed from December 23 to December 26. After Young was arrested and booked into jail, other pending charges and indictments were discovered: the murder indictment involved here (under the name Scott Dwayne Young); a cocaine possession/probation violation (under the name Michael Jones); another aggravated assault with a deadly weapon charge[2] and a "fugitive from New York" warrant (apparently under the name Mark Johnson). On December 26, 1988, Young (under the name Mark Johnson) was "magistrated"[3] by a Dallas County magistrate for the

3. In Texas, this is a term used to describe the procedure set out in article 15.17 of the Code of Criminal Procedure (hereafter referred to as the 15.17 proceeding), as distinguished from "arraignment" referred to in chapter twenty-six of the code. TEX.CODE CRIM.PROC.ANN. art. 15.17 (Vernon 1990). *See Watson v. State*, 762 S.W.2d 591, 594 n. 4 (Tex.Crim.App.1988).

above charges, including the murder charge now before us. During the 15.17 proceeding on December 26, the magistrate learned that Mark Johnson was also known as Scott Dwayne Young and Michael Jones. At that proceeding, the magistrate gave Young the required statutory warnings, including his right to an attorney. Young appeared to understand the warnings when given. The magistrate knew Young had been indicted on the murder charge but did not arraign him because he did not have a copy of the indictment.

On January 3, 1989, upon returning from vacation, police detective Bob Alexander, who was in charge of James Earl Jackson's murder investigation, got Young out of the county jail at about 7:15 p.m. and took him to the "crimes against persons" office at the police department, a room about eight by ten feet, to question him about Jackson's murder. Prior to questioning him, Alexander gave Young his *Miranda*[4] warnings. Young indicated that he understood the warnings and told the detectives that he did not have an attorney. He did not ask to consult with an attorney or to terminate the interview. Alexander did not tell Young he had already been indicted. After being questioned, Young signed the written statement he now challenges.

At the suppression hearing, the magistrate did not specifically recall the 15.17 proceeding, had no recollection whether Young requested an attorney, and had no notations in his file. He testified that if Young had requested counsel, an affidavit of indigency would have been in the district clerk's file in the murder case or in one of the other cases. The magistrate testified, in pertinent part:

[PROSECUTOR]: What else is your usual practice when you arraign a defendant?

[MAGISTRATE]: I have each person stand individually and tell them what they're charged with and ask them do they have a lawyer. If they don't have a lawyer, I ask them can they afford to hire an attorney. If they say no, I say would you like a court-appointed lawyer.

. . . .

[DEFENSE COUNSEL]: So you don't know whether or not he requested a lawyer, do you?

[MAGISTRATE]: No. I don't know at this point whether or not he requested a lawyer but if he had requested a lawyer, I would have had him sign an affidavit of indigency at that time.

. . . .

[PROSECUTOR]: All right. If he had a lawyer, is it not your practice to make a notation of the name of the lawyer in your paperwork?

[MAGISTRATE]: No, it is not the practice. It is the practice to make a notation of a lawyer if he has not been indicted because it's a part of the pre-indictment generation process. If he has not been indicted, we make a notation of a lawyer, but if a person has a lawyer and has been indicted, then we do not make a notation of the person—of that lawyer's name.

. . . .

[PROSECUTOR]: Judge, if anyone coming before you, if they want a lawyer, they're going to file an affidavit of indigency at that time?

[MAGISTRATE]: If they are charged with a felony offense and there is a warrant number assigned to that particular case and they request a court-appointed attorney and they answer the questions that I ask them in regard to whether or not they can afford to hire a lawyer, they will be allowed to sign an affidavit of indigency.

. . . .

[DEFENSE COUNSEL]: And if you had known that the Defendant was under indictment for murder as of December the 7th and still had not had any legal counsel whatsoever, would you have gone out of your way—or at least taken it upon yourself—to make a specific inquiry into the situation as to whether he had hopes of hiring a lawyer or whether he had made any effort to contact a

---

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

lawyer or any of that type of information?

....

[MAGISTRATE]: I would have asked the person—if I had known that they had been indicted and it had been more than two and a half weeks since the date of the indictment—if they had an attorney. And if they said they didn't have an attorney, I would ask them if they would like a court-appointed attorney. And if they said yes, I would have asked them to stand up and swear to the fact that they are, in fact, indigent and need a court-appointed attorney. If they said no, I would tell them in that case you need to try and contact the people or some attorney to represent them.

....

THE COURT: When you inquire as to whether or not a defendant needs a court-appointed lawyer or will hire a lawyer, you said that what you do is you fill out the affidavit and have the defendant sign it. Do you make any notations on the paperwork that you keep on whether or not you did this?

[MAGISTRATE]: Not the paperwork that I keep whether or not the affidavit of indigency has been signed. There is a notation made on the District Clerk's paperwork as to whether or not it's an affidavit of indigency or not.

THE COURT: All right. What is the District Clerk's paperwork?

[MAGISTRATE]: It is a—it amounts to just a computer printout that's torn in half and left in our records for a six-months' period.

THE COURT: All right. So if the District Clerk had a copy of that paperwork, they would no longer have it?

[MAGISTRATE]: They no longer have it.

....

[DEFENSE COUNSEL]: Well, what your responses are that if the system works like it's supposed to work, then there will be some notation somewhere in the District Clerk's files or in the computer as to whether or not the Defendant stated that he was indigent; is that correct?

[MAGISTRATE]: That's correct....

Young testified that he was arrested on December 22 on an aggravated assault charge and "arraigned" [5] on that offense on that same date under the name Mark Johnson. He was "arraigned" on December 26 on three other cases, including this murder case, on which he was "arraigned" under the name Scott Young. After he told the magistrate that he did not have an attorney, the magistrate gave him a paper which he signed as Mark Johnson,[6] swearing that he did not have any money or property to pay for a lawyer. The bailiff gave the paper back to the magistrate. On January 4, 1989, he was brought to the courthouse and spoke to attorney Ann Adair Dunlap about "the case." Young conceded that before Alexander questioned him at the police department on January 3 that he was given and understood his *Miranda* warnings, that he did not have an attorney, and that he neither requested an attorney nor asked to terminate the interview.

The trial court's chief clerk testified that the murder case was transferred from another court on January 11, 1989, and that the file did not contain an affidavit of indigency nor did it show the date Edward Gray, his trial counsel, was appointed. Gray testified that he was appointed on January 5, 1989, to represent Young on an aggravated assault case and later learned about this murder case. The trial court's coordinator testified that, as a result of her efforts to determine the events of Young's various cases in the various courts, she learned the following. On January 5, 1989, Gray was appointed on an aggravated assault case to represent "Mark Johnson." There was no affidavit of indigency in that file. On January 11, that case was transferred to the trial court where Young had other cases pending under the name Michael Jones. There was no affidavit of indigency in the murder file. On January

---

**5.** *See supra* note 3.

**6.** He testified he was told to use the name he was in jail under and brought to court under.

13, Gray was appointed to represent Young in *all* the cases.

The record reflects some dialogue between Young and the trial judge concerning "his papers" which Young contends contained a copy of the indigency affidavit. Gray testified that he remembered seeing an affidavit in Young's papers. The record does not show that the papers were ever found.

Except for Young's testimony, the record does not show whether Young requested an attorney at the 15.17 proceeding or, if a request were made, whether it was acted upon. The magistrate does not dispute Young's assertion that he requested an attorney; he simply does not recall. The clear import of the magistrate's testimony, however, is that the absence of an indigency affidavit in the file is circumstantial evidence that Young did not request an attorney.

### b. *Findings and Conclusions*

The trial court made the following findings and conclusions: Young was indicted for the murder offense on December 7, 1988. Young was arrested on December 22, 1988. He was "arraigned" for various offenses and under various aliases on December 26, 1988. Young was "arraigned" for the murder offense under his true name, Scott Dwayne Young. At the December 26 "arraignment" Young did not sign an affidavit of indigency for the appointment of an attorney under his true name, Scott Dwayne Young. Due to Young's various aliases, the trial court did not appoint counsel in the murder case until January 13, 1989. Young was given his *Miranda* warnings on January 3, 1989, at the time he gave the written statement. Young was aware of his right to have an attorney present at the time he made the statement. At no time during the police interview did Young request an attorney or request to terminate the interview. Young did not request an attorney at the time he signed the statement. The time and duration of the police interview were reasonable. Young was not denied water or bathroom privileges during the interview. No physical force was used or threatened and no promises were made to Young. Young voluntarily made and signed the confession.

### Points of Error

In his first point, Young contends that the trial court erred in admitting his written statement into evidence before the jury. He argues that his Sixth Amendment rights [7] were violated by police-initiated, uncounseled interrogation after he had been indicted and had requested counsel. In response, the State argues that Young's complaint is not preserved for review, and even if preserved, the trial court did not err in admitting the statement. Moreover, the State argues that, even if admission of the statement was error, it was harmless beyond a reasonable doubt. We address each of the State's contentions in turn.

### Sixth Amendment Claim

### a. *Preservation of error*

Noting that Young does not allege a violation of his Fifth Amendment rights under this point, the State argues that Young did not preserve his Sixth Amendment complaint for the following reasons: (1) the record contains no written motion to suppress; (2) Young objected at the suppression hearing only on the general generic "voluntariness issue;" and (3) Young's four objections before the jury did not state what specific legal provisions he was relying on.

▆▆▆ We agree with the State that, in order to preserve error, an objection must not only identify what is objected to, but must set forth specific grounds. The generally acknowledged policies of requiring specific objections are twofold. First, a specific objection is required to inform the trial judge of the basis of the objection and to afford him or her the opportunity to rule on it. Second, a specific objection is required to afford opposing counsel an opportunity to remove the objection or to supply

---

7. U.S. CONST. amend. VI.

other testimony. *Zillender v. State*, 557 S.W.2d 515, 517 (Tex.Crim.App.1977). In accordance with these policies, a number of exceptions to the general rule that a party cannot complain on appeal to the overruling of a general objection or an imprecise specific objection have been created. *Id.* Thus, where the .correct ground of exclusion was obvious to the judge and opposing counsel, no waiver results from a general or imprecise objection. *Id.*

■ In this case, the record reflects the following trial objections:

[DEFENSE COUNSEL]: Your Honor, we object to the admission of this on three grounds. First, that the Defendant was interviewed without an attorney at a point in time after he had requested a court-appointed attorney and stated in magistrate's court that he was indigent and should have had an attorney appointed to advise him and had not had an attorney due to the failure of Criminal District Court No. 3 to provide an attorney when it was requested.

Secondly, that the statement was obtained by mental duress, by taking him from his cell at night and taking him and placing him in an area, in a small room where he was kept for a long period of time and where he was unable to talk to an attorney.

And thirdly, that the statement was obtained from him by making promises to him, providing promises that he would obtain some favor or some benefit or in some way that his case would be treated more favorably.

And fourthly, that the statement was obtained from him by dishonest means or by basically a—by a process wherein he was not told that he had already been indicted for murder, and that the fact that he was indicted was concealed from him, and that he was placed under a false pretext by the police officers by leading him to believe that this case was under investigation when, in fact, he had already been indicted for the offense, in other words, that—

THE COURT: I understand what you're saying.

[DEFENSE COUNSEL]: They did not properly advise him of the facts and circumstances which would have allowed him to make an intelligent decision as to whether or not he should have a lawyer present and whether he should have had any conversation at all with this police officer, having already been indicted for the offense of murder.

For all of these reasons, Your Honor, we believe that the voluntary statement should not be admitted, that it is not, in fact, voluntary, that it is not the free act and deed of the Defendant.

In support of its position that Young did not preserve his Sixth Amendment complaint, the State relies on *Jackson v. State*, 745 S.W.2d 4, 5 n. 2 (Tex.Crim.App.1986); *Cisneros v. State*, 692 S.W.2d 78, 83 (Tex. Crim.App.1985); and rule 52 of the Rules of Appellate Procedure.[8]

*Jackson* is distinguishable. In that case, the court found that nothing was preserved because at trial the defendant specifically objected on *constitutional* grounds, both in form and substance, and then for the first time on appeal challenged on *statutory* grounds. In other words, it was not the *general nature* of the objection that precluded review, but rather, the assertion of *different specific grounds* at trial and on appeal. *See Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Crim.App.1990). We further conclude that *Thomas* and *Cisneros* are likewise distinguishable and provide no support for the State's contention. Here, the trial court accepted the form of the objection and specifically indicated that it understood the substance of the objection. It is clear from the objection that Young was complaining of uncounseled interrogation after he had been indicted which, among other things, rendered the written waiver ineffective and his statement involuntary. It is undisputed that the police initiated the interrogation. We conclude that Young preserved error.

8. Tex.R.App.P. 52(a).

## b. Merits

The State concedes that, *if Young had requested counsel on the already indicted murder case* during the 15.17 hearing, it *implicates his Fifth Amendment* rights under *Miranda*,[9] *Edwards*,[10] and *Arizona*,[11] all of which apply to custodial interrogation situations.

The State argues, however, that because Young has *not raised* a Fifth Amendment claim, those cases are not directly applicable to his Sixth Amendment right which is implicated when an indicted defendant requests counsel. It relies on *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Nehman v. State*, 721 S.W.2d 319 (Tex.Crim.App.1986); and *Alford v. State*, 788 S.W.2d 436 (Tex.App.— Houston [1st Dist.] 1990, no pet.). The State also refers us to *Holloway v. State*, 780 S.W.2d 787 (Tex.Crim.App.1989) (after an attorney has been appointed, attorney must be present when defendant waives Sixth Amendment right), but argues that *Holloway* does not apply here because no attorney had been appointed, thus no attorney had to be present when Young waived his Sixth Amendment right to an attorney. Interestingly, the State never points us to any record evidence of Young's waiver of his right to counsel, except, of course, to the written waiver of his Fifth Amendment right to counsel he signed at the police station at the time he gave the statement.[12] Instead, the State focuses on Young's failure to *request an attorney* and urges us, despite the fact that Fifth Amendment rationale was extended to the Sixth Amendment claims in *Michigan*, it should not be so extended here because of the complex facts of this case.

### Post-Indictment Case

█ It is undisputed that this is a post-indictment case, not a "custodial interrogation" case. To be sure, it also involves police-initiated custodial interrogation after indictment. Consequently, it is also undisputed that Young's Sixth Amendment right to counsel had attached at the time of questioning.[13] *Michigan*, 475 U.S. at 632, 106 S.Ct. at 1408–09; *McCambridge v. State*, 778 S.W.2d 70, 76 (Tex.Crim.App. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990). There can be little doubt that the United States Supreme Court interprets the rights under the Sixth Amendment to be more powerful than under the Fifth Amendment. *See* Yeager, *Rethinking Custodial Interrogation*, 28 Am.Crim.L.Rev. 1, 27 (1990). After indictment, the Fifth Amendment gives way to the Sixth Amendment, where, for better or worse, the Court reads the constitution to circumscribe police practices more closely than with the Fifth Amendment. *Id.* With that in mind, we proceed with our analysis.

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court held that an accused person in custody who had "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. at 1885. In *Minnick v. Mississippi*, —— U.S. ——, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Court stated that "[i]n context, the requirement that counsel be 'made available' refers to more than an opportunity to consult with an attorney outside the interrogation room." *Id.* 111 S.Ct. at 490. The Court specifically held that, when counsel is requested, the police may not initiate interrogation without counsel *present. Id.* 111 S.Ct. at 491.

---

**9.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

**10.** *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

**11.** *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

**12.** The *Miranda* rights and a waiver of those rights were printed on the voluntary statement form. For reasons we discuss later, we find that waiver legally ineffective.

**13.** Because Young had already been indicted, it is irrelevant that, under Texas law, a 15.17 proceeding does *not* constitute a critical stage of the proceedings triggering the right to counsel. *Watson v. State*, 762 S.W.2d 591, 594 n. 4 (Tex. Crim.App.1988).

In *Michigan,* the Supreme Court held that the rule in *Edwards* applies "with even greater force" to one who has been formally charged with a crime and who has requested appointment of counsel. *Michigan,* 475 U.S. at 636, 106 S.Ct. at 1411. In other words, the Court extended the Fifth Amendment *Edwards* rule to the Sixth Amendment. In doing so, it limited the Sixth Amendment version of the *Edwards* rule to the affirmative assertion of the right to counsel, leaving us in an "analytical straitjacket." *Michigan,* 475 U.S. at 641, 106 S.Ct. at 1413–14 (Rehnquist, C.J., dissenting). Finding ourselves in that "analytical straitjacket," we shall attempt to apply the Sixth Amendment version of the *Edwards* rule to the facts of this case.

█ There is no question that Young had a right to counsel. That right is clear. Young's Sixth Amendment right to counsel having attached upon indictment,[14] it seems clear that, *absent a valid waiver,* he had the right to the presence of an attorney at the post-indictment, police-initiated custodial interrogation. *See Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The question, then, is whether Young's written waiver of his *Miranda* rights was a valid waiver. We turn now to that issue.

### Waiver

#### a. Standard for Assessing Waiver

In *Michigan,* the Court recently reaffirmed the standard for assessing an alleged waiver of a defendant's Sixth Amendment right to counsel when it stated:

> Almost a half century ago, in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) ... a case involving an alleged waiver of a defendant's Sixth Amendment right to counsel, the Court explained that we should "indulge every reasonable presumption against waiver of fundamental rights." ... For that reason, it is the State that has the bur-

den of establishing a valid waiver.... Doubts must be resolved in favor of protecting the constitutional claim. This settled approach to questions of waiver requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel—we *presume* that the defendant requests the lawyer's services at every critical stage of the prosecution.

*Michigan,* 475 U.S. at 633, 106 S.Ct. at 1409 (emphasis added).

Specifically recognizing that the Sixth Amendment right to counsel does not turn on a defendant's request for counsel, the Court construed the respondent's affirmative request for counsel as an "extremely important fact in considering the validity of a subsequent waiver in response to police-initiated interrogation." *Id.* at 633 n. 6, 106 S.Ct. at 1409 n. 6.

#### b. Young's Request for Counsel

The State first argues that there is no competent evidence that Young requested an attorney. Because Young had been indicted, we must presume he requested counsel. *See Michigan,* 475 U.S. at 633, 106 S.Ct. at 1409. Even so, under *Michigan,* we must next determine if Young affirmatively requested counsel because an affirmative request for counsel is an "extremely important fact" in determining the validity of a subsequent waiver. *Id.* at 633 n. 6, 106 S.Ct. at 1409 n. 6.

Young testified that, at the time he was "magistrated" in this murder case, he told the magistrate he did not have an attorney and he signed an affidavit of indigency using the name he was in jail under. He returned the affidavit to the bailiff, who handed it to the magistrate. The trial court's file did not contain an affidavit. The magistrate did not recall whether Young signed an affidavit. The trial court found that "at the time of arraignment on December 26, 1988 the defendant did not

---

**14.** *See,* e.g., *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) ("[A] person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—whether by way of formal charge, preliminary hearing, *indictment,* information, or arraignment.") (emphasis added), quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion).

sign an affidavit of indigency for the appointment of an attorney *under his true name, Scott Dwayne Young.*" (Emphasis added.) It further found that "[d]ue to the defendant's various aliases, counsel was not appointed in this case by the court until January 13, 1989."

 Young's testimony that he affirmatively requested counsel is uncontroverted. The trial court's factual finding that Young did not sign an affidavit using his true name, Scott Dwayne Young, neither discredits Young's testimony nor contradicts Young's assertion that he did. Young testified that he signed the affidavit using the name Mark Johnson because the magistrate told him to use the name he was in jail under. Although the trial judge was permitted, even required, to evaluate the credibility of the testimony heard, she may not completely disregard the only positive evidence she heard. *Cf. Sansom v. Sprinkle,* 799 S.W.2d 776, 778 (Tex.App.—Fort Worth 1990, orig. proceeding). Thus, we conclude that the record reflects that Young affirmatively requested counsel.

 The State next argues that, even if Young had requested counsel, the police probably would not have been aware of it because of the various names and cases involved, the delay of the holidays, and the change in the court personnel. We are unpersuaded. As the Court has earlier stated:

> Sixth Amendment principles require that we impute the State's knowledge from one state actor to another. For the Sixth Amendment concerns the confrontation between the State and the individual. One set of state actors (the police) may not claim ignorance of defendant's unequivocal request for counsel to another state actor (the court).

*Michigan,* 475 U.S. at 634, 106 S.Ct. at 1410. In footnote, the Court further stated: "The Sixth Amendment also imposes on *the State* an affirmative obligation to respect and preserve the accused's choice to seek this assistance." *Id.* Furthermore, the fact that counsel was not yet

appointed at the time of the post-indictment, police-initiated interrogation is of no moment. In *McLeod v. Ohio,* 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965), the Court reversed a decision that the police could elicit information after indictment even though counsel had not yet been appointed.

In considering the above facts on the issue of the validity of the subsequent waiver, we hold that the post-indictment, uncounseled written waiver of Young's *Miranda* rights resulting from police-initiated interrogation was legally invalid. *See Michigan,* 475 U.S. at 636, 106 S.Ct. at 1411. The State failed to meet its burden of establishing waiver. Thus, the trial court erred in admitting Young's written statement. We must next determine whether the error warrants reversal of Young's conviction.

## HARMLESS ERROR

 The effect of the Sixth Amendment violation here is limited to the admission of Young's statement. Young argues only that "the harm and damage caused by the admission of the edited statement before the jury is apparent." The State contends that error, if any, was harmless. The Supreme Court has permitted a *Chapman v. California*[15] harmless error analysis where the effect of a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial. *See Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 1797–98, 100 L.Ed.2d 284 (1988).

The essence of Young's statement is as follows. Early in the morning on June 29, he saw a man, later identified as the deceased, harassing a lady. He confronted the man and told him to leave. The man asked Young who the hell he thought he was and pulled a knife. Young pulled a .357 Magnum and started chasing him. A group of Young's friends joined in. Young fired two or three shots and his friends also fired shots. The man fell down but got up and continued running. Young and his friends ran away in the other direction. "Bufford" Bernard, a 17-year-old, was

**15.** 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

shooting a .22 caliber automatic 10 clip that looked like an Uzi or a little rifle with an extension on it. Bernard is in jail for two other murders. Young does not know the names of the others.

Deborah Jones testified at trial that at 3:00 a.m. on June 29 she went to an upstairs apartment to buy some cocaine. The seller was at a window inside the apartment and there was a line of people there. Young, whom she had seen many times before, came up the stairs behind her. She was not under the influence of drugs or alcohol at the time. She bought $10 worth of cocaine. As she started down the stairs, she saw the deceased coming up the stairs. He had his hands in his pockets. Young told the deceased to take his hands out of his pockets. A few minutes later, she saw the deceased leaving. Young was following him. Young had nothing in his hands. The guy who had sold the cocaine came out of the apartment and handed Young a gun.

Young shot the deceased once from behind. Jones saw sparks come from the gun. The deceased turned and looked back but kept going. Young got closer to the deceased and shot him from behind several times. The deceased fell. Young walked away. The cocaine seller walked up to the deceased and kicked him. The gun Young had was the only one she saw. About five minutes later the police came. Jones talked to them. The police later showed Jones a photo-spread which contained pictures of Young and Bernard. Jones identified Young.

Seven spent .22 caliber shell casings were later found at the scene. Evidence showed the deceased was killed by a .22 caliber weapon.

During its deliberations (at about 12:15 p.m.) the jury asked to have reread Jones's testimony about seeing Young fire the second burst of shots. Afterwards, the jury went to lunch. The guilty verdict was returned at 2:00 p.m. We conclude, therefore, that the jury rejected Young's statement in favor of Jones's testimony.

Based on all the above facts, we conclude beyond a reasonable doubt that the error in admitting Young's statement did not contribute to the jury's guilty verdict or to the punishment assessed.[16] See Satterwhite, 108 S.Ct. at 1798.

## PRETEXT, DECEPTION

■ In point of error two, Young contends that the trial court erred in admitting before the jury his written statement because it was obtained in violation of his Fifth Amendment rights.[17] He argues that the detectives obtained the statement under false pretext, by deception, by keeping him up into the late hours beyond his accustomed bedtime, and by refusing to accept his initial statement that he knew nothing about the offense. Young contends in his brief that he "was in no condition to intelligently, knowingly, and voluntarily waive his Fifth amendment rights when the 'voluntary statement' was taken from him."

We have reviewed the record and the totality of the circumstances concerning the taking of the confession. We hold that the trial court did not abuse its discretion in finding that the confession was freely and voluntarily given. It is undisputed that, prior to the commencement of the interrogation that led to the written confession, Young was warned of his constitutional rights and indicated that he understood these warnings. Young testified that there was no physical abuse, threats, promises, or coercion in securing his confession. There is nothing in the record to suggest the contrary. Young also claims that his confession was obtained under false pretext and deception because he was not told that he had been indicted in the murder case. However, on cross-examination Detective Alexander testified as follows:

> [DEFENSE COUNSEL]: What did you-all talk about for those two hours?
> [DETECTIVE ALEXANDER]: I explained to him what he was charged with

16. Young had a prior conviction in the same court for unlawful possession of cocaine.

17. U.S. Const. amend. V.

and who I was, that I was the detective that had filed the case on him and explained to him what the charge was and where the offense occurred and when it occurred.

[DEFENSE COUNSEL]: Did you explain to him that he had already been indicted?

[DETECTIVE ALEXANDER]: I don't recall.

■■■■ The record also shows that the magistrate gave Young the statutory warnings [18] and told him that he had been indicted, but did not give him the specifics of the indictment. The trial judge is the sole judge of the credibility of the testimony and the witnesses. *Gentry v. State*, 770 S.W.2d 780, 790 (Tex.Crim.App.1988). It was the province of the judge to resolve this conflict in testimony. *Jackson v. State*, 672 S.W.2d 801, 804 (Tex.Crim.App. 1984). Furthermore, even if at the time of interrogation the detectives had not informed Young that he was the target of the murder investigation, his confession made during the interrogation would not *for that reason alone* be involuntary and inadmissible. *See Sanchez v. State*, 454 S.W.2d 210, 213 (Tex.Crim.App.1970). We overrule point of error two.

### EDITING

In point of error three, Young contends that his case must be reversed because the State massively edited his "voluntary statement" and thereby changed the context of the statement and rendered it much more prejudicial and incriminating than it would be if it had been fairly presented. Young argues that the statement was so altered that it did not reasonably resemble his original statement.

■■■■ Young presents no authorities to support his argument as required by rule 74(f). *See* TEX.R.APP.P. 74(f). In addition, Young has waived his "editing" com-

plaint because he failed to object at trial. *See* TEX.R.APP.P. 52(a). Even if Young had not waived error, we could not say that the trial court erred in admitting his statement because of editing or alteration thereof. Under the law at the time of trial, the State was required to delete portions of a defendant's statement for which it did not "vouch" [19] and failure to delete such portions could result in an insufficiency in the State's proof and an entry of a verdict of acquittal. Under the "rule of optional completion," Young had the option of offering the entire statement into evidence. *See* TEX.R.CRIM.EVID. 107. Instead, he chose to read his own edited version to the jury on cross-examination. Because we find no error in admitting Young's partial statement into evidence, we overrule point of error three.

The trial court's judgment is affirmed.

**18.** TEX.CODE CRIM.PROC.ANN. art. 15.17 (Vernon Supp.1991).

**19.** The voucher rule was discussed in *Palafox v. State*, 608 S.W.2d 177, 181 (Tex.Crim.App.1978). This voucher rule was abolished in *Russeau v. State*, 785 S.W.2d 387, 390 (Tex.Crim.App.1990)

where the Court stated that the State was no longer required to delete portions of a defendant's statement or face an acquittal due to rule 607 of the Texas Rules of Criminal Evidence. TEX.R.CRIM.EVID. 607.