**Maria Del Carmen HERNANDEZ, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 04–05–00634–CR.**

Court of Appeals of Texas, San Antonio.

Nov. 1, 2006.

Discretionary Review Granted April 4, 2007.

**8**

Lori O. Rodriguez, Asst. Public Defender, San Antonio, for appellant.

Daniel Thornberry, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, REBECCA SIMMONS, Justice.

## OPINION

Opinion by REBECCA SIMMONS, Justice.

On September 2, 2005, a jury found Appellant Maria Del Carmen Hernandez guilty of the offense of capital murder and assessed punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. On appeal, Hernandez claims the trial court erred in: (1) admitting an out-of-court statement in violation of appellant's right of confrontation and (2) allowing the prosecutor to question appellant regarding a popular country song. Because we fail to find any reversible error, we affirm the judgment of the trial court.

### FACTUAL BACKGROUND

Appellant Maria Del Carmen Hernandez became friends with Cassandra Leffew and Dolores Rodriguez while all three were living at the Bexar County Battered Women's Shelter. Leffew left the shelter in June 2004 and invited Hernandez and her three children to live in her home. Hernandez moved into Leffew's home with Leffew and her four children. When Rodriguez left the shelter, she returned to her home in south Bexar County. After Hernandez's move, Robert Fernandez, the father of Hernandez's youngest son and the man with whom Hernandez had an "on again off again" relationship, reunited with Hernandez and moved into Leffew's residence with Hernandez.

On July 24, 2004, Leffew, Hernandez, and Fernandez took their combined seven children swimming at the apartment complex of Leffew's boyfriend. The children swam with Hernandez and Fernandez while Leffew remained in the apartment with her boyfriend. When Fernandez went to the apartment with his son and Leffew's one and a half year old daughter, Leffew accused Fernandez of abusing her daughter, claiming the child had a boot-shaped bruise on her back and the expression of a sexual assault victim. Fernandez denied the claims. Although Leffew approached Hernandez with her concerns, Hernandez refused to believe such claims and encouraged Leffew to take the child to the doctor. The child, however, was not taken for medical treatment. Despite the accusations, the following evening, Leffew, Hernandez, and Fernandez took all seven children to visit Dolores Rodriguez.

While at Rodriguez's home, Leffew offered Fernandez a drink into which she

had crushed numerous prescription drugs with the hope that Fernandez would "start talking" and "volunteer a confession." To her dismay, Fernandez maintained his innocence and never confessed to harming the child in any manner. Fernandez eventually passed out from the alcohol and medication. Hernandez asserts that she argued with Leffew objecting to the further drugging of Fernandez, but she was ordered to stay in the other room. Subsequently, Fernandez's hands and feet were tied and he was placed in the trunk of Leffew's car. The three women left, with Fernandez bound in the trunk, and Rodriguez driving. Hernandez's children were left in the care of Leffew's brother and Pablo Barros Bermandino.

After driving around for some period of time with Fernandez still tied up in the trunk, Leffew suffered a panic attack, requiring Hernandez to stop at the Texan Ice House and call an ambulance. The ambulance arrived after approximately 20 or 30 minutes. Hernandez claims that during the time they were waiting for the ambulance, she tried to obtain help from a bartender but was unable to communicate in Spanish. Hernandez further alleges her attempts to check on Fernandez were stopped by Rodriguez. After Leffew refused transport by the EMS, the women drove Leffew home where she remained.

Rodriguez and Hernandez drove back to Rodriguez's house with Fernandez still tied up in the trunk. When they arrived, Rodriguez instructed Hernandez to place trash bags over Fernandez's head and to smother him. Hernandez claims that she refused to do so. Allegedly, Rodriguez then took the bags and covered Fernandez's head. When Fernandez fought back, Hernandez claimed she tried to help him but Rodriguez pushed her away and used panty hose to secure the bag tightly around his neck. Rodriguez then departed

with Fernandez in the trunk leaving Hernandez at the house with the children. Hernandez admits that she later called Fernandez's aunt, Roxanne Fernandez, claiming that she and Fernandez argued whereupon Fernandez left on foot and she was unable to find him. Hernandez returned to Leffew's home the following day. Fernandez's body was discovered in a ditch in rural Bexar County on July 26, 2004.

Hernandez was charged with capital murder and a jury convicted and sentenced her to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice.

## OUT-OF-COURT STATEMENT

During its case in chief, the defense called two inmates to testify regarding statements made by Leffew, both of which tended to implicate Leffew and exonerate, at least to some degree, Hernandez. Although the State argued that the defense would be "opening the door" to Leffew's written statement taken by Detective Damiani, there was no hearsay objection to the testimony by the State.

The first inmate, Veronica Molina, testified that Leffew talked regularly about what happened and apparently felt no remorse about any of her actions. Leffew never explained why, but repeatedly stated that she had never liked Fernandez and that she gave him alcohol and pills because "they talk better when they're drunk." Leffew told Molina that Hernandez had tried to stop her and Rodriguez from harming Fernandez and Leffew threatened Hernandez if she interfered or if she said anything. Leffew also offered that she and Rodriguez even had a plan to fraudulently purchase an insurance policy on Fernandez and collect the money. Finally, Leffew described Hernandez as young and naive and that she would do

whatever she was told to do, which included remaining silent. Molina also testified about her conversations with Hernandez, describing how Hernandez professed her love for Fernandez. Hernandez told Molina that she tried to stop Leffew and Rodriguez on the night of the murder, but that Leffew had threatened her kids and that was why she kept quiet.

The second inmate, Maria Renteria, also testified that Leffew talked freely about the murder. Leffew explained that she and Rodriguez drugged Fernandez's drink, but that after their first attempt failed, they added more drugs. Leffew said she wanted to lock Hernandez in the other room because she kept trying to help Fernandez, but the doors at her residence did not lock. Finally, Renteria explained that Leffew could not believe Hernandez brought Fernandez into Leffew's home, knowing that he was a child molester and that he had served time for molesting children in the past.

In an attempt to rebut these statements, the State recalled Detective Damiani to read portions of the statement taken from Leffew (the "statement"). Outside the presence of the jury, the State argued that Leffew's prior inconsistent statement given to Damiani was being offered to impeach the hearsay statement of Leffew as testified to by the inmates. The defense, on the other hand, argued that the statement could not be a prior inconsistent statement because Leffew did not testify at trial about her statements to the inmates. The State explained, "that's the problem, Judge. They put somebody on to say what Cassandra [Leffew] said and they put it on to the jury wanting them to believe it's true. So there's a prior inconsistent statement." The trial court gave the jury both oral and written limiting instructions and allowed Damiani to read

the following portions of Leffew's statement:

I finally got sick myself because I was so upset. I ended up throwing up all over myself. I had to take a shower. As I was finishing my shower, I heard Maria say, "He's waking up," I told Maria that I had more—I had more Ativan—Ativan in my purse.

When I got out of the bath, after taking my shower, Maria told me that she had used some other pills that Dolores had around. I don't know what they were. After that, Dolores and Maria carried Robert to my Chevrolet Lumina and put him in the trunk. I was not strong enough to help.

Once he was in the trunk of the car, I had Dolores drive me to a gas station at FM something going back towards 410 to go to my house from Dolores'.

Anyway, we stopped so that I could get some Aspirin. I needed Aspirin because I was sick and shaking all over. Also it thins my blood to help me avoid another stroke.

When I got to the gas station, I called my husband and told him I was sick. He told me to come home. That's why I'm—I'm sure he's still alive. After—After that, Dolores and Maria left with Robert in the trunk. The time was between 10:30 p.m. and 11:00 p.m.

About an hour-and-a-half to two hours later, I got a phone call from Maria. Maria told me, "I finished it girl." I asked her what she meant by—by "finished it" and she said, "It's done."

I said, "Come on. You mean, he's dead?" And Maria said, "Yeah, dead." I asked her if—if she was sure that he was dead and Maria said that she was very sure. Maria told me that she had—had killed him with her own hands. She told me that she put a plastic bag on his head to smother him, but that he

kept fighting and ripping the bag and that he wouldn't die and that he didn't want to die.

Maria told me that when—that—that she then took some panty hose from the trunk of the car and put them around his neck while he was face-down and put a foot on the back of his head and pulled the panty hose until he wasn't breathing any more. She told me that after Robert was dead, she threw him into a ditch, where no one would find him. Maria said it was somewhere near the Bexar—Bexar County/Atascosa County line.

The plastic bags and panty hose were mine and had been in the trunk. I never imagined Maria would use those items to kill Robert. In fact, I never imagined that she would kill Robert at all. That's not what was supposed to happen.

I just wanted to beat him up and drop him off somewhere. I have not been able to eat or sleep since this happened. All I've been able to do is cry. It was not my intention to kill Robert, and he was still alive when I last saw—last time I saw him. I have no idea if Dolores was present when Robert was killed.

The trial court allowed the testimony with a limiting instruction.[1]

## A. Standard of Review

Normally, an appellate court reviews a trial court's decision to include or exclude evidence under an abuse of discretion standard. *See Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996). However, we review a constitutional legal ruling de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex.Crim.App.2006).

## B. Texas Rule of Evidence 806

■■■ In all prosecutions, the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, "to be confronted with the witnesses against him." U.S. CONST. amends. VI, XIV; *Crawford v. Washington*, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford*, the

---

1. The State claims the statement was being offered to impeach the credibility of Leffew. The trial court's oral instructions were as follows:

And before you testify, ladies and gentlemen, as I indicated to you in the instructions, some testimony may be introduced for a very limited purpose.

And I also instructed you that if that were to occur, I would instruct you to consider that evidence only for an express limited purpose and you must further do so under your oath—under the oath you have taken as jurors.

The testimony that you are about to hear is tendered for an express limited purpose; and, that is, for the purpose of impeaching the testimony of—or—or testimony that was heard during testimony of Veronica Molina and Maria Renteria, if, in fact, you think it does impeach their testimony regarding the—any purported statements that may have been made by Cassandra Leffew.

So, again, the limited instruction that I'm giving you is you—you are to consider the following testimony as impeachment if it is, in fact impeaching at all. Of course, that's going to be subject to your determination in making credibility decision about any purported statements of Cassandra Leffew.

The trial court's written instructions stated:

You are instructed that a statement may be impeached by showing that other and different statements out of court have been made. Such impeachment evidence may be considered by you to aid you in determining the weight and credibility, if any, to be given the statement at trial, and is not to be considered as tending to establish the alleged guilt of the defendant in such case. Therefore, the statement made by Cassandra Leffew to Alfred Damiani was admitted for the limited purpose of impeaching the alleged statements made by Cassandra Leffew as testified to by Veronica Molina and Maria Renteria, if you find that it does so impeach, and you cannot consider said impeachment testimony as any evidence of the guilt of the defendant.

Supreme Court held that the Confrontation Clause bars the admission of an out-of-court testimonial statement made by a witness who does not testify unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness. *Id.* at 68, 124 S.Ct. 1354. Therefore, to trigger the protections afforded by the Confrontation Clause, an out-of-court statement must be made by an absent witness and be testimonial in nature. *Id.* Here, because Leffew invoked her Fifth Amendment right not to testify, there is no dispute that Leffew was not available for cross-examination.

The State claims *Crawford* does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. As such, the State argues that portion of Leffew's statement admitted before the jury was not a violation of the defendant's right of confrontation because the statement was used only to impeach the credibility of Leffew and thus was not used for the truth of the matter asserted. We agree.

The State relies on Rules 806 and 613 as the means by which to allow impeachment of a witness with a prior inconsistent statement.

Rule 806 states:

When a hearsay statement, or a statement defined in Rule 801(e)(2)(C), (D), or (E), ... has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, offered to impeach the declarant, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

Tex.R. Evid. 806.

■ In effect, Rule 806 allows the impeachment of a non-testifying hearsay declarant by eliciting statements from a testifying witness. In part, the triggering event under Rule 806 is the introduction of a hearsay statement. *Id.* In this case, the introduction of Leffew's statements to Molina and Renteria triggered Rule 806. The State then was allowed to make use of Rule 806, in combination with Rule 613(a), in order to impeach Leffew. If Leffew had testified at trial, either party would have been permitted to impeach her credibility with any prior statements that were inconsistent with her trial testimony. *See* Tex.R. Evid 613. Rule 613(a) requires a party first give the witness the opportunity to explain or deny the inconsistent statement. Although the purpose of Rule 613 is to provide fairness for the party unable to cross-examine the declarant of a hearsay statement, Rule 806 explicitly waives this requirement. *See* Tex.R. Evid. 806. *See Marcel v. State*, 64 S.W.3d 677, 679 (Tex.App.-Houston [1st Dist.] 2001, pet. denied).

■ Hernandez, on the other hand, claims that she did not waive her constitutional rights by introducing Molina's and Renteria's hearsay statements. Yet, so long as a statement is not presented for the truth of the matter asserted, the defendant's Sixth Amendment rights are not transgressed. *United States v. Barone*, 913 F.2d 46, 49 (2d Cir.1990). Nothing in *Crawford* is to the contrary. *See Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. 1354 (stating "[t]he [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing

the truth of the matter asserted"). Therefore, under Rule 806, Damiani's testimony regarding Leffew's statement was admissible as evidence of a prior inconsistent statement.

■ Hernandez further asserts that even if Leffew's written statement was offered as impeachment evidence, the jury could not help but consider the evidence for its substance. Essentially, Hernandez's arguments focus on Leffew's statement being offered for the truth of the matter asserted. Although the State specifically offered, and the trial court admitted Leffew's written statement for impeachment only and not for the truth of the matter asserted, the Court of Criminal Appeals acknowledged in *Head v. State,* 4 S.W.3d 258, 261–62 (Tex.Crim.App.1999) (en banc), "[w]hether the disputed testimony violates the hearsay prohibition necessarily turns on how strongly the content of the out-of-court statement can be inferred from the context." In other words, the appellate court must look beyond the admission of the evidence for impeachment and determine "whether the strength of the inference produces an 'inescapable conclusion' that the evidence is being offered to prove the substance of an out-of-court statement." *Id.* at 266. We do not believe the evidence reaches this level.

Prior to any controverted testimony, the trial court instructed the jury that they were to consider Leffew's written statement *for impeachment purposes only* and not as substantive evidence of Hernandez's guilt. A similar instruction was included in the jury charge. Moreover, during closing argument, the State neither argued nor alluded to Leffew's written statement as substantive evidence. Despite her allegations, the record does not support Hernandez's position that the statement was necessarily understood by the jury as substantive evidence. Because the

evidence was properly admitted under Rule 806, and we presume the jury follows the instructions given to them by the trial court, we are unable to conclude that the statement was utilized for any purpose other than as impeachment evidence. *Abdnor v. State,* 871 S.W.2d 726, 740 (Tex. Crim.App.1994) (en banc) (noting that when a limiting instruction is given, there is a presumption that the jury will properly consider the evidence). Accordingly, Hernandez's Sixth Amendment right of confrontation was not transgressed and we overrule Hernandez's first point of error.

### PROSECUTORIAL MISCONDUCT

■ During cross-examination, the State questioned Hernandez regarding a popular country song about the demise of an abusive spouse entitled "Goodbye Earl" recorded by the Dixie Chicks. Hernandez alleges the prosecutor's questions were suggestive of Hernandez's intent and plan, specifically "[t]hey decided Robert had to die, just like Earl." In doing so, Hernandez argues the prosecutor relied on her own, unsubstantiated testimony as to the song's lyrics and relevance. Although defense counsel did lodge an objection at the beginning of the State's cross-examination based on relevance, the State argues that the defense failed to properly object with regard to prosecutorial misconduct and thereby failed to preserve error.

■ An appellate court reviews allegations of prosecutorial misconduct on a case by case basis. *Stahl v. State,* 749 S.W.2d 826, 830 (Tex.Crim.App.1988) (en banc). The review is not limited to only the facts of each case, but also the probable effect on the jurors' minds. *Hodge v. State,* 488 S.W.2d 779, 781–82 (Tex.Crim.App.1973). Courts have held a prosecutor's conduct inappropriate where the prosecutor's actions deliberately violate an express court order, and where misconduct is "so blatant

as to border on being contumacious." *Stahl*, 749 S.W.2d at 831. To trigger reversal, the question must be obviously harmful to the defendant. *Ransom v. State*, 789 S.W.2d 572, 585 (Tex.Crim.App. 1989) (en banc); *Gonzales v. State*, 685 S.W.2d 47, 49 (Tex.Crim.App.1985) (appellate courts rarely reverse a conviction due to an improper prosecutorial question). Additionally, it must be of "such a character so as to suggest the impermissibility of withdrawing the impression produced." *Huffman v. State*, 746 S.W.2d 212, 218 (Tex.Crim.App.1988) (en banc).

■ To preserve error for prosecutorial misconduct, the appellant must: (1) make a timely and specific objection; (2) request an instruction to disregard the matter improperly placed before the jury; and (3) move for mistrial. *See* TEX.R.APP. P. 33.1; *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim.App.1993) (en banc). *See also Huffman*, 746 S.W.2d at 218 (defendant must object that the prosecutor's question was "clearly calculated to inflame the minds of the jury and [was] of such a character so as to suggest the impermissibility of withdrawing the impression produced"). Although defense counsel did make a timely objection, there was no request for an instruction, nor did he move for a mistrial. Thus, in accordance with TEX.R.APP. P. 33.1, Hernandez failed to preserve the error for appeal.

■ Assuming, arguendo, defense counsel properly preserved error, a prosecutor is traditionally given great leeway in posing questions and making reasonable deductions from the evidence. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex.Crim.App. 1988). Although the analogy to a song may not have been a direct deduction from the evidence, there is nothing to suggest that the prosecutor's line of questioning was clearly calculated to inflame the minds of the jury or that it was of such a charac-

ter so as to suggest the impermissibility of withdrawing the impression produced. A prompt instruction to disregard will generally cure an error associated with an improper question and answer. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex.Crim.App. 2000) (en banc). Having reviewed the record, we do not believe the testimony was so inflammatory or of such a character that, had Hernandez requested an instruction to disregard, the instruction would not have cured any prejudicial effect.

Because Hernandez failed to preserve error, or alternatively, the prosecutor's statements were not so egregious that they could not have been cured by an instruction from the trial court, we overrule Hernandez's second point of error.

### CONCLUSION

The judgment of the trial court is affirmed.