*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★ ★ ★ ★ ★

## MEMORANDUM OPINION

No. 04-07-00522-CR

Joshua Brian **TORRES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No.1, Bexar County, Texas
Trial Court No. 874137
Honorable Al Alonso, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:    Catherine Stone, Chief Justice
Phylis J. Speedlin, Justice
Steven C. Hilbig, Justice

Delivered and Filed:   January 14, 2009

AFFIRMED

In eight issues, Joshua Torres appeals his misdemeanor conviction for driving while

intoxicated.  We affirm the judgment of the trial court.

## BACKGROUND

At about midnight on August 11, 2003, emergency personnel responded to a one-car accident

at the intersection of Basse Road and San Pedro Avenue in San Antonio.  Torres's pick-up truck had

hit a light pole, and knocked it into the intersection. Torres, the sole occupant, was pinned behind the steering wheel and rescue personnel used the "jaws of life" to remove him from the vehicle. He was immediately transported to University Hospital for treatment. At the hospital, both a medical and a legal blood draw were performed; both draws yielded blood alcohol concentrations above the legal limit. The State charged Torres with driving while intoxicated, alleging both (1) intoxication *per se* (having "an alcohol concentration of 0.08 or more in his body"), and (2) intoxication by loss of the normal use of his mental and physical faculties by reason of the introduction of alcohol into his body.

In September 2006, a hearing was held on Torres's motion to suppress at which he argued that the results of the blood tests should be suppressed due to his lack of consent and a break in the chain of custody. The trial court denied the motion to suppress. The case was called for trial in May 2007, almost four years after the accident. Several witnesses testified on the State's behalf at trial. Nurse Deborah Fulton, who testified at the suppression hearing, was unavailable at trial and her testimony was read into evidence by the prosecutor. Because the State unwittingly waived and abandoned the intoxication *per se* paragraph during trial, the jury charge only included the second definition of intoxication—loss of the normal use of Torres's mental and physical faculties by reason of the introduction of alcohol into the body. The jury found Torres guilty, and the trial court sentenced him to 180 days in jail, fully probated and suspended for two years, plus a $1,500 fine. Torres timely appealed.

## DISCUSSION

On appeal, Torres chiefly complains of: (1) the denial of his motion to suppress the blood test results; (2) the admission of Nurse Fulton's former testimony; (3) the sufficiency of the evidence to support his conviction; and (4) prosecutorial misconduct.

***Admission of Blood Test Results—Denial of Motion to Suppress***

Generally, we review a trial court's ruling on a motion to suppress for an abuse of discretion. *Dyar v. State,* 125 S.W.3d 460, 462 (Tex. Crim. App. 2003). We apply a bifurcated standard of review to motions to suppress, giving almost total deference to the trial court's determination of historical facts, while reviewing *de novo* the court's application of the law. *Maxwell v. State,* 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). We defer to the trial court's rulings on "'mixed questions of law and fact' if the ultimate resolution of those questions turns on an evaluation of credibility and demeanor." *Loserth v. State,* 963 S.W.2d 770, 772 (Tex. Crim. App. 1998). "In a motion to suppress hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony." *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Accordingly, the trial court may believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted. *Id.* We do not engage in our own factual review, but determine only whether the record supports the trial court's fact findings, and, if so, we address only the question of whether the trial court properly applied the law to the facts. *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). If the trial court's ruling was correct on any theory of law applicable to the case, in light of what was before the court at the time, then we will uphold the ruling. *Sauceda v. State,* 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).

### A.    *Legal Blood Draw*

Initially, Torres contends that the trial court abused its discretion in failing to suppress the admission into evidence of the result of the legal blood draw taken from him after his car accident because the State failed to establish the proper predicate for admission of the blood test results.

In order for the results of a blood test to be admitted into evidence, a proper chain of custody of the blood sample that was drawn from the accused and later tested must be established. *Durrett v. State,* 36 S.W.3d 205, 208 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Avila v. State*, 18 S.W.3d 736, 739 (Tex. App.—San Antonio 2000, no pet.) (proper chain of custody must be established to admit the results of scientific testing).  Proof of the beginning and end of the chain will support admission of the evidence absent any showing it was tampered with or altered.  *Durrett,* 36 S.W.3d at 208 (citing *Stoker v. State,* 788 S.W.2d 1, 10 (Tex. Crim. App. 1989), *abrogated on other grounds by Leday v. State*, 983 S.W.2d 713 (Tex. Crim. App. 1998)).  Any gaps in the chain go to the weight of the evidence rather than to its admissibility.  *Durrett,* 36 S.W.3d at 208; *Penley v. State,* 2 S.W.3d 534, 537 (Tex. App.—Texarkana 1999, pet. ref'd).

During the 2006 pre-trial motion to suppress hearing, the State called Nurse Deborah Fulton to testify.  Fulton stated she was working at University Hospital on August 11, 2003 when Torres was treated.  Fulton admitted that she had no independent recollection of treating Torres, but she refreshed her memory from the nursing record she prepared when Torres was admitted to the ER.  Fulton testified that she performed two legal blood draws on Torres on August 11, 2003:  the first at 2:30 a.m. and the second at 3:50 a.m.  A legal blood draw, as opposed to a medical, or routine, blood draw, is done at the request of law enforcement.  Fulton's notes indicate that Torres consented to the legal blood draw, saying, "Okay, yes."  She detailed the procedure she follows for blood draws, including cleaning the draw site, drawing the blood, and labeling the tubes with the patient's addressograph label; she initials the addressograph label at the time of the blood draw.  The blood tubes are then placed in a tamper-proof pouch, sealed, and turned over to the police officer requesting the blood sample; the pouch contains the officer's badge number, the time of the draw,

and the time the officer received the pouch. Fulton identified a pouch with her signature on it, the time and date, and the name of the officer it was turned over to—Officer Gabriel Sanford. Fulton similarly testified that she again drew Torres's blood at 3:50 a.m. and also turned that sample over to Officer Sanford.

On cross-examination, Nurse Fulton explained that, in the case of legal blood draws, the hospital requires the person drawing the blood to sign a form and attest to it before a notary, stating that he or she is the person who drew the blood, and stating the name of the person from whom the blood was drawn; this form goes to the medical examiner's office with the blood specimen. Fulton acknowledged that there was no notarized form in Torres's medical file, even though such a form had been filled out in every blood draw she had ever performed. In denying the motion to suppress, the trial court adopted the State's proposed findings of fact and conclusions of law, concluding that "a proper chain of custody of the blood specimens that were drawn from the defendant and subsequently tested was established."

On appeal, Torres contends the State failed to establish the very first link in the chain of custody with regard to the legal blood draw—that the blood tested was, in fact, drawn from Torres's body. Torres's argument focuses on the fact that a notarized form by Nurse Fulton was not included within the State's exhibits or documentation entered into evidence at either the suppression hearing or trial. Torres contends that even though there is no case law or statute requiring a notarized form for blood draws, it is necessary in an instance such as this where Fulton had no independent recollection of drawing Torres's blood and could not identify Torres at the hearing. Torres maintains that without a witness who could independently recollect the blood draw, or documentation

establishing that Fulton actually drew the blood from Torres, the State failed to establish the first link of the chain of custody.

In response, the State contends that the absence of the notarized form is not fatal because Fulton's testimony at the suppression hearing established the beginning of the chain of custody; as discussed below, Fulton's testimony from the hearing was admitted at trial. As noted, Fulton identified her signature on the blood vial which contained Torres's addressograph label. In addition, there was testimony establishing the end of the chain of custody. Officer Sanford testified that he delivered the blood specimen given to him by Nurse Fulton to the lock box at the Bexar County Medical Examiner's Office. Michael Frontz, a senior toxicologist chemist for the Medical Examiner's Office, stated that according to the toxicology request form, he was the last person in the chain of custody of that blood sample.

In *Cordero v. State*, No. 08-05-00285-CR, 2007 WL 4724675, at *7 (Tex. App.—El Paso Jan. 17, 2007, pet. ref'd) (not designated for publication), the appellant similarly argued that there was no evidence of the beginning of the blood specimen's chain of custody due to the State's failure to make a routing report part of the record in the case. The El Paso court held that while the routing report "would certainly be helpful to further establish the chain of custody," witness testimony was sufficient without it to prove the beginning and end of the chain. *Id.* Any remaining gaps in the chain would only affect the weight and credibility of the evidence, not its admissibility. *Id.*; *see also Penley*, 2 S.W.3d at 537.

Similarly, in Torres's case there was also sufficient witness testimony through Nurse Fulton to prove the beginning of the chain of custody without the notarized form. Fulton testified based on her nursing record that she drew the blood pursuant to Officer Sanford's request, and that the tubes

were labeled with Torres's information, initialed by Fulton, sealed, and delivered to Officer Sanford. Accordingly, the trial court did not abuse its discretion in denying the motion to suppress the results of the legal blood draw and admitting that evidence at trial. We overrule Torres's first issue.

### B. *Medical Blood Draw*

In his second issue, Torres asserts the trial court abused its discretion in failing to suppress the result of the "medical," or routine, blood draw because the State wholly failed to establish the chain of custody. Torres claims that the State introduced the results of the medical blood draw through a nurse who did not treat Torres, but merely testified regarding hospital procedures. The nurse did not know what time the blood was drawn or who drew it; thus, Torres contends there was no proof that a proper chain of custody was maintained in relation to Torres's medical blood draw.

The State responds that it is not necessary that the person who actually drew or tested the blood testify in order to establish the first link in the chain of custody. *See Durrett*, 36 S.W.3d at 210-11; *see also Beck v. State*, 651 S.W.2d 827, 829 (Tex. App.—Houston [1st Dist.] 1983, no pet.) (fact that doctor did not remember who actually took sample went to weight, not admissibility, as other evidence established beginning and end of chain). The State contends that the testimony of two nurses at the suppression hearing established the beginning and the end of the chain of custody, and thus constituted a sufficient predicate for admissibility. Nurse Eloise Morales testified that it is standard hospital procedure to draw a patient's blood when the patient is designated as a "Code 3 trauma," which Torres qualified as due to his car accident. Although Morales did not draw Torres's blood, she stated that his blood was taken because (i) the blood draw is automatic in a Code 3 situation and (ii) Torres's medical records reflect that labs were performed. Once the blood sample is taken, Morales testified that it is labeled with the patient's information and deposited in a window

in the hospital lab a "few steps" away from the trauma room. Nurse Fulton similarly testified that a medical blood draw is automatic in a Code 3 situation; the tube containing the blood is labeled with an addressograph containing the patient's information and hand-delivered to a lab across the hall, which quickly processes the blood sample.

We agree that the State was not required to prove who actually drew the blood from Torres's body. The facts of this case are very similar to those in *Durrett*, in which none of the witnesses could recall who actually drew the medical blood sample from the defendant. *See Durrett*, 36 S.W.3d at 209-11. The court of appeals held that the beginning and end of the chain of custody were proved by witnesses who testified that a physician requested the blood sample, which was identified as Durrett's at the time it was collected for analysis by an emergency room employee pursuant to hospital policies and procedures; the blood sample was then promptly sent by pneumatic tube to the hospital laboratory for analysis by a medical technologist. *Id.* at 210. Because Durrett did not claim there was any tampering with or alteration of the evidence, or suggest that hospital procedures were not followed, proof of the beginning and the end of the chain of custody was sufficient to support admission of the evidence. *Id.* at 211. The court of appeals held that the fact that a particular witness did not recall taking the blood from Durrett goes to the weight, not the admissibility, of the evidence. *Id.*

Here, Nurses Morales and Fulton testified to the hospital procedures that are followed when performing a medical blood draw and stated that a medical blood draw is "automatic" in a trauma case like Torres's; there was no suggestion by Torres that these procedures were not observed. *See Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997) (holding that absent evidence of tampering, most questions concerning care and custody of a substance go to the weight, not

admissibility, of the evidence). Additionally, as in *Durrett*, more than three years had passed between Torres's accident and the hearing on the motion to suppress; it was to be expected that the witnesses could not independently recall who took the medical blood sample from Torres's body. *See Durrett*, 36 S.W.3d at 211 (noting that because more than two years had passed between the car accident and the suppression hearing, it was understandable that memories would fail, "but this is not a *per se* defect"). Accordingly, we cannot conclude that the trial court abused its discretion in denying the motion to suppress and admitting the results of the medical blood draw. Torres's second issue is overruled.

### Former Testimony of Unavailable Witness

#### A. Unavailability and Due Diligence

Torres next argues that the trial court abused its discretion in admitting Nurse Fulton's testimony from the suppression hearing into evidence at trial because the State failed to establish that Fulton was unavailable, and failed to use due diligence to secure her presence at trial.

The Texas Rules of Evidence permit the admission of former testimony given by an unavailable declarant at another hearing of the same or different proceeding if the party against whom the testimony is offered had the opportunity and similar motive to develop the testimony. TEX. R. EVID. 804(b)(1). A declarant is "unavailable" if she is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity. TEX. R. EVID. 804(a)(4). To introduce previous testimony of an unavailable witness, the proponent of the testimony must demonstrate that a good faith effort was made prior to trial to locate and present the witness. *Reyes v. State,* 845 S.W.2d 328, 331 (Tex. App.—El Paso 1992, no pet.). At the same time, the rules do not require the proponent to perform every improbable effort that, in hindsight, might have produced the witness. *Urbano v. State,* 808 S.W.2d 519, 522 (Tex. App.—Houston [14th Dist.]

1991, no pet.). We review a trial court's ruling that evidence is admissible under Rule 804(b)(1) for an abuse of discretion. *Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994).

Mid-trial, the State informed the trial court that one of its chief witnesses, Nurse Fulton, was unavailable to testify because she was in the hospital and had not been released as expected. Because Fulton had testified at the 2006 suppression hearing, and was subjected to cross-examination at that time, the State requested to read Fulton's prior testimony to the jury pursuant to Rule 804(b)(1). The next day, the prosecutor was sworn-in and testified regarding Fulton's current hospitalization and unavailability to testify. According to the prosecutor, Fulton had "no idea" when her doctor would discharge her from the hospital. The prosecutor offered to provide the court with Fulton's hospital telephone number, and also offered to take Fulton's testimony by deposition in the hospital, if necessary. Over a defense objection, the trial court determined that Fulton was unavailable to testify and permitted the State to read into evidence Fulton's testimony from the suppression hearing. Certain portions of the testimony, including objections sustained by the trial court, were redacted.

Torres first argues that the State failed to show that Fulton was "unavailable" due to "then existing physical illness or infirmity" under Rule 804(a)(4). Both federal and state authorities support finding a witness to be unavailable when hospitalized or recently released from the hospital, so long as the State has made a good faith effort to secure the witness's testimony. *See, e.g., U.S. v. Sutherland,* 656 F.2d 1181, 1201 (5th Cir. 1981) (hospitalized witness was unavailable for purposes of FED. R. EVID. 804(a)(4)); *see also U.S. v. Donaldson*, 978 F.2d 381, 392-93 (7th Cir. 1992) (holding that key witness who had recently delivered a child and was hospitalized for chest pain the day before trial was unavailable for the purpose of admitting former testimony); *see also*

*Caldwell v. State*, 916 S.W.2d 674, 676 (Tex. App.—Texarkana 1996, no pet.) (holding that elderly witness who had just undergone knee replacement surgery and showed subpoena server her fresh scar was unavailable to testify at trial). Here, the evidence was undisputed that Fulton was hospitalized at the time of trial, with no foreseeable discharge date; thus, she was "unavailable" for purposes of Rule 804.

As to whether the State made a good faith effort to secure Fulton's presence at trial, Torres asserts the prosecutor knew three weeks prior to trial that Fulton was hospitalized for chronic conditions, including diabetes and renal failure, but did not inform the court or defense counsel of her status until mid-trial; further, he contends the State should have issued a witness subpoena or asked for a continuance. The prosecutor explained that she did not ask for a continuance because at the time she announced "ready" for trial she believed Fulton would be released from the hospital in time to testify.

The trial court was entitled to make a credibility assessment and believe the prosecutor's testimony that Fulton was currently hospitalized and had not been discharged as anticipated by the State; moreover, Fulton could not guarantee a discharge date in the near future. The trial court had an interest in moving the trial forward, especially because almost four years had elapsed since the accident. *See Ecker v. Scott*, 69 F.3d 69, 72-73 (5th Cir. 1995) (holding trial court should be inclined to admit prior testimony if witness is suffering from chronic illness and is unlikely to recover within a reasonable length of time). Based on the record, we cannot conclude the trial court abused its discretion in determining that Nurse Fulton was unavailable to testify at trial under Rule 804(a)(4), and that the State made a good faith effort to secure her appearance. Torres's third issue is overruled.

### B.      *Adequate Opportunity to Cross-Examine*

In his fourth and fifth issues, Torres contends he did not have an adequate opportunity to cross-examine Fulton at the suppression hearing, and therefore the trial court erred in admitting Fulton's suppression testimony under Rule 804(b)(1).  TEX. R. EVID. 804(b)(1) (providing that former testimony of an unavailable declarant is not excluded under the hearsay rule if it was given "as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. . . .").  Further, Torres asserts that Fulton's former testimony constituted testimonial hearsay, and its admission violated his right of confrontation under the Sixth Amendment to the United States Constitution as set forth in *Crawford v. Washington*, 541 U.S. 36 (2004).  In *Crawford*, the United States Supreme Court held that admission of testimonial hearsay violates a defendant's Sixth Amendment right to confrontation unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination.  *Id.* at 68.  The parties do not dispute that the motive for cross-examination remained the same at trial as at the suppression hearing, given that at both proceedings defense counsel sought to undermine the State's attempt to prove a proper chain of custody for the legal blood draw.  *See Bee v. State,* 974 S.W.2d 184, 188 (Tex. App.—San Antonio 1998, no pet.).  Therefore, having already concluded that Nurse Fulton was unavailable to testify at trial, we must determine whether Torres was afforded an adequate opportunity to cross-examine her at the suppression hearing.

Torres maintains that the defense was severely limited in its questioning at the suppression hearing.  *See Granados v. State*, 85 S.W.3d 217, 227 (Tex. Crim. App. 2002) (holding that the rules of evidence, with the exception of privileges, do not apply to suppression hearings).  In his briefing,

Torres identifies two main lines of questioning that he was not permitted to pursue at the suppression hearing. First, he was not allowed to question Fulton regarding the fact that she had initially drawn an "insufficient" amount of blood from Torres; second, he was not allowed to ask Fulton if she had any personal knowledge as to whether the hospital machine used to test the blood was working properly. Any potential harm as to these two lines of questioning, however, was later remedied at trial. Neither the State nor the defense addressed the initial insufficient blood draw, and Fulton was allowed during the suppression hearing to answer the question about the lab machine, stating she does not operate the lab machine and would not know how it operated.

Other than these two areas of cross-examination, Torres does not specify what further questions he would have asked Fulton at trial; without such a showing, we may not speculate as to how additional questioning would have benefitted Torres. For the reasons stated, we cannot conclude that the trial court abused its discretion in admitting Fulton's former testimony at trial under Rule 804(b)(1), nor can we conclude that Torres was deprived of the right to confront Fulton in violation of the Sixth Amendment. *See Crawford*, 541 U.S. at 68. Accordingly, Torres's fourth and fifth issues are overruled.

### *Sufficiency of the Evidence*

In his sixth and seventh issues, Torres argues that the evidence is legally and factually insufficient to sustain his conviction for driving while intoxicated. Specifically, he claims the State's evidence failed to establish that he did not have the normal use of his faculties at the time he was driving. In reviewing legal sufficiency, we consider all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979);

*Vodochodsky v. State,* 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). The jury is permitted to resolve conflicts in the evidence and make reasonable inferences from the evidence; as the trier of fact, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Mosley v. State,* 983 S.W.2d 249, 254-55 (Tex. Crim. App. 1998). In reviewing factual sufficiency, we consider all the evidence in a neutral light, giving almost complete deference to the jury's determinations of credibility. *Lancon v. State,* 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We will reverse the conviction only if the evidence in support of the verdict, although legally sufficient, is so weak that the verdict is clearly wrong and manifestly unjust, or if, considering conflicting evidence, the verdict is outweighed by the great weight and preponderance of the evidence. *Id.*

To obtain a conviction for driving while intoxicated, the State must prove that the defendant operated a motor vehicle in a public place while intoxicated. TEX. PENAL CODE ANN. § 49.04(a) (Vernon 2003). "Intoxicated" means not having the normal use of mental or physical faculties by reason of the introduction of alcohol into the body *or* having an alcohol concentration of 0.08 or more. TEX. PENAL CODE ANN. § 49.01(2) (Vernon 2003) (emphasis added). In this case, the jury was charged under only the first definition.

At trial, Erica Martinez, a waitress at Tiffany's Billards, testified that she waited on Torres and two friends between 7:00 p.m. and 8:30 p.m. on the night of the car accident. Martinez, who testified that she is certified by the Texas Alcoholic Beverage Commission, stated that she believed Torres was intoxicated the night of the accident; he was slouched in a chair, not talking, and he appeared to be in a daze. She did not serve Torres any alcohol because "he looked like he'd had enough." However, Martinez never saw Torres consume any alcohol, and did not observe him

driving; Martinez stated that Torres was at the bar less than an hour. She went with his friends between 9:30 p.m. and 10:00 p.m. to look for Torres, and they later encountered the accident scene. Martinez had difficulty identifying Torres at trial until shown his police booking photo taken several months after the accident.

Officer Gabriel Sanford, who arrived first at the accident scene, testified that he followed EMS to the hospital because Torres was under arrest for suspicion of DWI. Officer Sanford made the decision to arrest Torres based on the circumstances of the one-car accident and the smell of intoxicants coming from the vehicle. At the hospital, the attending physician told Officer Sanford that Torres had suffered a collapsed lung, a sternal fracture, a neck injury, and a small heart attack. Robert Byer, a paramedic who treated Torres at the scene of the accident, testified that Torres was pinned behind the steering wheel of the truck and was "disoriented." Because Torres smelled of alcohol, Byer asked him if he had been drinking; Torres responded that he had "drank lots of alcohol." Byer stated that, in his opinion, it was "possible" that Torres was intoxicated at the time of the accident.

Irene Hurd, a laboratory technician at University Hospital, testified that the result of the medical blood draw received by the lab at 12:58 a.m. was a blood alcohol concentration ("BAC") of 287 miligrams per deciliter. She also testified that an alcohol concentration range between 250 and 400 miligrams per deciliter equates to a "stupor." J. Rod McCutcheon, Chief Toxicologist for the Bexar County Medical Examiner's Office, testified that the result of the legal blood draw taken at 3:50 a.m. was a BAC of 0.16 grams per deciliter. McCutcheon converted the results from the medical draw to compare with the results of the legal draw. He stated that the medical draw showed a BAC somewhere in the range of .23 to .25 grams per deciliter. Based on McCutcheon's 36 years

of experience in the field, he opined that an individual with a 0.16 BAC or higher would have a loss of his normal mental and physical faculties; however, McCutcheon acknowledged that the way in which alcohol affects an individual depends on a number of factors, including whether the person rarely drinks or routinely drinks.

We conclude there was legally and factually sufficient evidence to support the jury finding that Torres had lost the normal use of his faculties at the time of the accident. Although Torres contends that the small heart attack he suffered may have precipitated the wreck, the evidence supporting the verdict is not so weak that the verdict seems clearly wrong and manifestly unjust, and the verdict is not outweighed by the great weight and preponderance of the evidence. Accordingly, Torres's sixth and seventh issues are overruled.

### *Prosecutorial Misconduct*

Finally, Torres argues that the prosecutor committed prosecutorial misconduct, when, during closing arguments, she told jurors that they could convict Torres on legally insufficient evidence, resulting in an unfair trial and a violation of his right of due process. As noted, the State waived and abandoned the paragraph of the information charging Torres with intoxication *per se*, *i.e.*, a BAC of 0.08 or more; accordingly, the jury was only charged on intoxication through the loss of normal physical or mental faculties. However, during closing argument, the prosecutor referred to the *per se* definition on several occasions, urging jurors that they should find Torres guilty if they concluded his blood alcohol concentration was above the legal limit.

Specifically, Torres identifies three instances in which he claims the State made an improper closing argument to the jury. The prosecutor told jurors that the absence of the 0.08 instruction from the jury charge made their job:

a little harder, but that doesn't mean that the testimony about these numbers, almost three times the legal limit and double the legal limit, is useless. What this means is now you have to take this and you have to decide if somebody at three times the legal limit, Lord only knows where he was here at 11:55 when he had that accident, has lost the normal use of their mental and physical faculties, considering medical research shows 0.04 is doing it for most folks.

. . . good thing we all have common sense. Good thing we all have an education. Because we do know that a little over an hour later, with no drinks consumed, unless they gave him a 40 ounce in the ambulance, which I doubt, when the medical draw was done, he was at anywhere from .23 to .25 grams per deciliter of alcohol. Or .287 milligrams per deciliter, which Ms. Hurd testified equates, on a scale that has been used for the better part of 25 years, to being in a stupor with no drinks consumed in between. And then no drinks consumed again for just under three hours between this test and the legal blood draw again at 3:50 a.m., which returned results of .16, double the legal limit. So if it managed to go down this much from here to here, where was it here?

I just want to make sure that we're clear on the law, the three ways of proving intoxication versus what's in the charge. I believe that it's correct to say that the jury can find, if they believe the testimony that he was over 0.08, that that resulted in a loss of mental and physical faculties, normal physical faculties. So is that correct? Would that be a correct statement?

We review allegations of prosecutorial misconduct on a case by case basis. *Stahl v. State,* 749 S.W.2d 826, 830 (Tex. Crim. App. 1988); *Hernandez v. State*, 219 S.W.3d 6, 13 (Tex. App.—San Antonio 2006), *aff'd,* No. PD-1879-06, 2008 WL 4569865 (Tex. Crim. App. Oct. 15, 2008). The review is not limited to only the facts of each case, but also the probable effect on the jurors' minds. *Hodge v. State,* 488 S.W.2d 779, 781-82 (Tex. Crim. App. 1973). A prosecutor's conduct has been held inappropriate where the prosecutor's actions deliberately violate an express court order, and where misconduct is "so blatant as to border on being contumacious." *Stahl,* 749 S.W.2d at 831. To warrant reversal, the prosecutor's argument must be obviously harmful to the defendant, *Ransom v. State,* 789 S.W.2d 572, 585 (Tex. Crim. App. 1989), and must be of "such a character so as to suggest the impermissibility of withdrawing the impression produced."

*Hernandez*, 219 S.W.3d at 14 (quoting *Huffman v. State,* 746 S.W.2d 212, 218 (Tex. Crim. App. 1988)).

To preserve error for prosecutorial misconduct, the appellant must make a timely and specific objection, request an instruction to disregard, and move for a mistrial. *See* TEX. R. APP. P. 33.1; *see also Hernandez,* 219 S.W.3d at 14; *see also Huffman,* 746 S.W.2d at 218 (defendant must object that the prosecutor's question was "clearly calculated to inflame the minds of the jury and [was] of such a character so as to suggest the impermissibility of withdrawing the impression produced").

Here, Torres wholly failed to object to the first two statements.[1] As to the third statement, which was made by the prosecutor during the course of a State's objection to the defense's closing argument, defense counsel objected, "she's testifying, Judge," but failed to secure a ruling from the trial court; moreover, that trial objection does not comport with the complaint being raised on appeal, *i.e.*, prosecutorial misconduct. Further, there was no request for an instruction to disregard and no motion for a mistrial. Therefore, with respect to this issue, Torres failed to preserve any error for appeal. *See* TEX. R. APP. P. 33.1(a). Accordingly, Torres's final issue is overruled.

### CONCLUSION

Based on the foregoing reasons, the judgment of the trial court is affirmed.

Phylis J. Speedlin, Justice

Do not publish

---

[1] Torres contends that he attempted to object, but "the nature of the prosecutor's conduct made objecting to it particularly difficult . . . ." Our review of the record, however, does not support this assertion, and we have not located any objections or attempted objections in response to the specified arguments.