Paul Christopher PENLEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 06-98-00082-CR.

Court of Appeals of Texas,
Texarkana.

Submitted July 27, 1999.

Decided Aug. 23, 1999.

James Michael Murphy, Dallas, for appellant.

Tom O'Connell, Dist. Atty., David Waddill, Asst. Crim. Dist. Atty., McKinney, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice GRANT.

Paul Christopher Penley was charged by indictment for the offense of intoxication manslaughter. The first trial ended in a hung jury. In the second trial, the jury found Penley guilty and assessed punishment at fourteen years' confinement in the Texas Department of Criminal Justice, Institutional Division, and a $10,000 fine. Penley appeals his conviction.

In six points of error, Penley contends (1) the trial court erred in admitting into evidence State's exhibits 23 and 23A which contained blood drawn from Penley on the day of the accident; (2) the trial court committed material error likely to injure Penley's rights when it deprived him of his federal and state rights of confrontation and cross-examination of State's witnesses, Christi Wilson and Sandy Collins; (3) the trial court committed material error likely to injure Penley's rights when it excluded evidence he offered of changes in the policy of handling blood evidence on cross-examination of State's witness Christi Wilson; (4) the trial court committed material error likely to injure Penley's rights when it denied his motion in limine; (5) the trial court erred in refusing to grant him a new trial when it was shown on a proper motion for new trial that there was jury misconduct; and (6) the trial court erred in admitting expert testimony by police officer Sammy Knapp.

There is evidence showing that on Sunday, October 1, 1995, at approximately 10:30 p.m., Shalom Diaz and her sister, Shanasy Heines, went to a dance club on

Greenville Avenue in Dallas. While at the club, Penley bought them a drink. Penley and the sisters left the dance club together at approximately 2:00 a.m. They went to a tattoo parlor near downtown, but returned to the parking lot of the dance club after finding the tattoo parlor closed. Diaz fell asleep in the back seat of her sister's car, and Penley and Heines got into Penley's car, which was parked nearby. Penley and Heines began kissing and became intimate.

Around 5:00 a.m., Officer Bryan Topp awoke Diaz, asked her for identification, and told her to go home. Officer Topp went over to Penley's car and knocked on the window. The door opened, and Officer Topp saw two nude individuals, who were later identified as Penley and Heines. Officer Topp testified that in his opinion, Heines was extremely intoxicated. Officer Topp smelled a slight odor of alcohol on Penley's breath, but Penley did not exhibit any signs of intoxication. Officer Topp allowed Diaz, who was sober, to drive Heines home. Penley told Officer Topp that he was visiting Dallas, that he did not have a place to stay, and that he was spending the night in the parking lot. Officer Topp testified he would have let Penley drive away from the parking lot, but Penley had indicated he was going to stay there.

Around 6:25 a.m., Melissa Fitzgerald was on her way to work, traveling westbound on Highway 121. She noticed a white Cadillac in front of her crossing the center line and weaving in and out of traffic. Fitzgerald testified that as she approached the intersection of Highway 121 and Custer Road, she saw the white Cadillac run into a Dodge Colt that was stopped at the red light. The impact pushed the Colt into the intersection, and the Colt hit the right rear panel of another car turning left onto Highway 121. The driver of the white Cadillac, who was later identified as Penley, got out of his car and tried to open the door of the Colt. Fitzgerald went over to aid Penley and noticed a strong smell of alcohol on his breath. Fitzgerald testified that shortly thereafter, Penley went over to his car and returned with the smell of mouthwash on his breath. Fitzgerald testified that she did not notice any signs of life from the passenger. Kristine Marie Flood, the driver of the Colt, died as a result of the accident.

Sammy Knapp, a motorcycle officer with the Plano Police Department, arrived at the scene at 6:40 a.m. Officer Knapp testified that he smelled a moderate odor of alcohol on Penley. Officer Knapp asked Penley if he had been drinking, and Penley said no. Officer Knapp asked Penley to get his insurance information, and when he returned, Officer Knapp testified that Penley had the sweet smell of mouthwash on his breath. Officer Knapp asked Penley again if he had been drinking and Penley said he had had three Crown Royals and Coke. Penley told Officer Knapp he looked down to adjust his radio, and when he looked up, he saw another car in front of him, and he hit the other car. Other than the smell of alcohol on his breath, Officer Knapp testified that Penley did not exhibit any signs of intoxication.

Two other officers joined Officer Knapp at the scene, Officers Matt Dawson and Larry Frazier. Officer Dawson performed two horizontal gaze nystagmus ("HGN") tests on Penley and determined that Penley was intoxicated. Officers Dawson and Frazier took Penley to a nearby hospital where nurse Molly Golson drew a blood sample from Penley. After the blood sample was drawn, Officers Dawson and Frazier took Penley to the police station. While in the patrol car on the way to the station, the officers noticed the smell of alcohol in the car. At the station, Officer Knapp made a videotape of Penley.

Kenneth Evans, a chemist with the Department of Public Safety (D.P.S.), tested the blood sample, and he testified the results showed Penley had 0.10 grams of alcohol per 100 milliliters of blood, showing that Penley was legally intoxicated at the time of the blood draw. Ron Oliver, the

State's expert on intoxication matters, testified that at the time of the accident (approximately 6:30 a.m.), Penley's blood alcohol level would have been between .125 and .154.

Penley contends the trial court erred in admitting the blood evidence (State's exhibits 23 and 23A) because the State failed to show the requisite chain of custody necessary to establish that the blood sample admitted and tested by Evans was the same blood sample taken from Penley. State's exhibit 23 is a mailing tube containing a vial (State's exhibit 23A) of Penley's blood (hereinafter blood evidence). Penley contends there was a break in the chain of custody between Officer Dawson and Christi Wilson, a property evidence specialist with the Plano Police Department. Penley argues that the blood evidence was the critical fact that led to his conviction and that without a proper showing of the chain of custody from the time the blood was drawn until it was tested at the D.P.S. laboratory, his conviction cannot stand. The State contends Penley waived this point of error because he made a general objection which is insufficient to preserve error on appeal.

■ To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion.[1] If a party fails to do this, error is not preserved, and the complaint is waived.[2] Penley objected that no proper foundation had been laid for State's exhibits 23 and 23A and that the exhibits were hearsay and, thus, not admissible. Upon reviewing the testimony prior to the objection, we find Penley's objection was sufficient to apprise the judge that he was complaining about a break in the chain of custody.

Penley claims there was a break in the chain of custody because of several inconsistencies in the testimony of Officers Knapp, Dawson, and Frazier, and property evidence specialist Wilson: (1) Officer Dawson testified that he personally gave the blood evidence to Wilson at 9:25 a.m. on October 2, 1995; that he did not turn in the D.W.I. videotape made by Officer Knapp; and that it was not his handwriting that listed the D.W.I. videotape in the description section on the property evidence tag; (2) Officer Frazier testified that Officer Knapp was present at the time of the blood draw, but Officer Knapp testified that he was not in the room during the blood draw; and (3) Wilson testified that she did not receive the blood evidence personally from Officer Dawson, but that she checked in the blood and the D.W.I. videotape after retrieving them from the evidence locker at noon on October 2, 1995. Penley contends these inconsistencies and the absence of any writing signed by nurse Molly Golson indicating she drew the sample of blood indicates a break in the chain of custody.

■ In order for the results of a blood test to be admissible in evidence, a proper chain of custody of the blood sample that was drawn from the accused and later tested must be established.[3] Proof of the beginning and the end of the chain will support admission of the evidence barring any showing of tampering or alteration.[4] Any gaps in the chain go to the weight of the evidence rather than to its admissibility.[5]

---

1. *See* Tex.R.App. P. 33.1(a)(1).

2. *See Taylor v. State*, 939 S.W.2d 148, 155 (Tex.Crim.App.1996).

3. *Moone v. State*, 728 S.W.2d 928, 930 (Tex. App.-Houston [14th Dist.] 1987, no pet.) (citing *Brown v. State*, 156 Tex.Crim. 144, 240 S.W.2d 310, 311 (Tex.Crim.App.1951); *Lynch*

*v. State*, 687 S.W.2d 76, 77–78 (Tex.App.-Amarillo 1985, pet. ref'd)).

4. *See Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim.App.1989); *Mello v. State*, 806 S.W.2d 875, 878 (Tex.App.-Eastland 1991, pet. ref'd).

5. *See Stoker*, 788 S.W.2d at 10; *Mello*, 806 S.W.2d at 878 (citing *Beck v. State*, 651

Wilson testified that as a property evidence specialist, she is in charge of the care, custody, and control of evidence brought to the police department. Wilson testified that the officers can either give the evidence to her, they can drop it into lockers, or they can drop it into a mailbox. Once an officer puts evidence in a locker or in a mailbox, the only people who can retrieve it are herself, Sandy Collins, another property evidence specialist, and their supervisor, Ben Armstrong. Wilson testified that when officers turn in evidence, they have to fill out a property evidence tag (a white card or sheet) describing the evidence, date, and time. The card goes into evidence with the actual property.

When Wilson retrieves evidence from the lockers or the mailbox, she writes down the time she checks in the evidence, and if she personally receives evidence from an officer, she not only notes the time, but she also checks a box labeled *in person* on the property evidence tag. After she receives the property, she fills out a yellow tag with the file number, her initials, the item number, and the date, and she assigns a bin location to the item. This yellow tag is attached to every piece of evidence she receives.

On October 2, 1995, Wilson checked in the mailing tube and the vial at noon. The blood evidence was accompanied by a property evidence tag from Officer Dawson. Wilson testified that she retrieved the blood evidence from a locker and that she did not receive it in person from Officer Dawson because she had not checked the "in person" box on the property evidence tag. The property evidence tag (exhibit 22) showed that Officer Dawson submitted the evidence at 9:25 a.m. It described two items: (1) the D.P.S. mailing tube containing the vial of Penley's blood, and (2) a videotape of Penley's D.W.I. interview. Wilson testified that State's exhibit 23 containing State's exhibit 23A was the same tube that Officer Dawson

turned into evidence because the file number on the tube matched the file number on the property evidence tag.

The record reflects that Penley signed the consent form giving permission for the blood draw and that Officer Knapp read the mandatory D.W.I. warnings to Penley before he gave his consent. Officer Dawson testified that he took one blood tube kit with him to the hospital and that Nurse Golson cleaned Penley's arm with betadine before drawing his blood. (Betadine does not contain alcohol; therefore, when using betadine there is no danger of a positive result for alcohol.) Officer Dawson testified that he was present during the entire blood draw, that he never left the room, and that Nurse Golson drew Penley's blood and placed it into the blood vial.

After she put the blood in the vial, she handed the vial to Officer Dawson. Officer Dawson testified that the vial was placed in a tube similar to a mailing tube and the tube was sealed. Officer Dawson testified that State's exhibit 23 was the same tube that he put the vial in because of the way it was marked. He testified that both he and Officer Knapp filled out the labels for the tube and sealed it and that it was the same blood vial because it had Officer Knapp's signature on it. After putting the blood vial in the tube, Officer Dawson kept the tube in his possession until he turned it over to Wilson at 9:25 a.m. Officer Dawson testified that in his report he stated that he gave the sample to Wilson, but he did not distinctly remember going to Wilson's office and handing the sample to her. He testified that he personally gave the evidence to Wilson because that was what his report stated. He testified that he did not drop off the D.W.I. videotape, but that he did drop off the blood evidence. He testified that he filled out the property evidence tag because it was in his handwriting, but he also testified that the listing on the property evidence tag for the D.W.I. videotape was not in his handwriting. Of-

ficer Knapp testified that he left the room prior to the blood draw to check on the driver of the Colt and that he returned about ten minutes later.

Wilson testified that she retrieved from a locker the blood sample and the D.W.I. videotape, along with the property evidence tag. She testified that she checked in the tube, filled out a yellow tag, attached it to the tube, and placed it in a basket in the office. She testified that the office is inside the police department and is secure. Only Collins, Armstrong, and she have the key to the office. She testified that the evidence stayed in the basket until Collins took it to the D.P.S. laboratory on October 20, 1995, that it was picked up from the D.P.S. laboratory on December 20, 1995, and that it was taken directly to the property room at Plano City Hall, where it was placed in the bin number assigned to it. Wilson testified that the blood sample was never mishandled, lost, or handled by anyone other than herself or Collins after Officer Dawson dropped it off.

Collins also testified that the office where the basket was located is locked when she, Wilson, or Armstrong are not in the office and that any evidence to be taken to the D.P.S. laboratory is placed in the wire basket. When they accumulate enough evidence for testing, either she or Wilson take the basket to the D.P.S. laboratory. She testified that she took State's exhibit 23 to the D.P.S. laboratory on October 20, 1995, and hand-delivered it to an employee of the laboratory. The laboratory stamped the yellow tag with the date the evidence was received. Underneath the stamp, she placed her signature. Collins testified that she also fills out an acceptance form, which is signed by her, the laboratory employee who takes the evidence, and all the other employees who are in the laboratory at that time. The acceptance form is dated and timed.

Evans testified that he received a blood sample brought in by Sandy Collins on October 20, 1995, that he assigned it a number, and that State's exhibit 23 had the same number as the tube he received that day. Evans testified he performed the blood analysis and that State's exhibit 23A contained the same blood as the blood he analyzed because it had the laboratory case number and his initials on it.

■ Based on the foregoing testimony, we find there is sufficient proof of the chain of custody. Officer Dawson's testimony that he handed the blood evidence to Wilson is not a break in the chain of custody because he testified that he turned the evidence over at 9:25 a.m. and Wilson testified that she retrieved the evidence from the secured locker. The fact that she retrieved both the D.W.I. videotape and the tube and vial from the locker does not indicate a break in the chain of custody. The blood evidence was accounted for from the time the blood was drawn until the time that Evans identified State's exhibit 23A at trial as being the same blood that he tested. Further, any break in the chain of custody would only go to the weight and not to the admissibility of the evidence.[6] This point of error is overruled.

■ In his next two points of error, Penley contends the trial court committed material error likely to injure his rights (1) when it deprived him of his Texas and federal rights of confrontation and cross-examination, and (2) when it excluded evidence of policy changes concerning the handling of blood evidence after Penley's first trial in 1996. Prior to Wilson's testimony, the State made a motion in limine to prevent Penley from offering evidence on the Plano Police Department's policy changes with regard to the handling of blood evidence after the first trial. The State argued that the evidence of policy changes should be excluded because Penley's "expert at the last trial said that it [the failure to refrigerate the blood] was mishandling of the evidence and was negli-

---

6. *See Stoker,* 788 S.W.2d at 10; *Mello,* 806 S.W.2d at 878.

gent." In his brief, Penley states that his expert, Dr. William T. Lowry, testified during the first trial that the handling of the blood evidence made any testing of Penley's blood sample unreliable. Dr. Lowry said the testing was unreliable because of the way the blood was drawn and because the blood was stored at room temperature for eighteen days before it was tested. The trial court granted the motion in limine under Rule 407 of the Texas Rules of Criminal Evidence.[7] In an offer of proof, Penley elicited testimony from Wilson that because of Penley's first trial, the department now refrigerates all blood samples and sends evidence for testing every week. Penley contends that the trial court improperly excluded this evidence and that the effect of its exclusion was to deprive him of his right to confrontation and cross-examination of the State's witnesses, Wilson and Collins.

An appellate court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard.[8] An appellate court reverses a trial court's ruling if is was not within the zone of reasonable disagreement.[9] The general rule is that the granting of a motion in limine filed by the State does not preserve error for appeal.[10] Here, Penley preserved error because he made an offer of proof.[11]

Rule 407 of the Texas Rules of Criminal Evidence states

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent remedial measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent remedial measures when offered for another purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment.[12]

Subsequent remedial measures can take many forms: repairs, installation of safety devices, changes in policy, design changes, providing or modifying warnings, or the firing of an employee.[13] The two reasons for exclusion are generally that (1) the rule encourages safety precautions,[14] and (2) the rule excludes unreliable evidence.[15] Rule 407 is found within the Texas Rules of Civil Evidence and the Texas Rules of Criminal Evidence. The language in each is the same. We did not find any cases construing the criminal rule; therefore, we will cite cases construing the civil rule.

The event here was Dr. Lowry's testimony during the first trial that the police department's handling of the blood evidence made the testing of the blood sample unreliable. It is undisputed that Penley's blood sample was stored unrefrigerated for eighteen days before being sent to the D.P.S. laboratory. Now, department policy requires that all blood samples be refrigerated and that all evidence needing analysis be sent to the D.P.S. laboratory once a week. During Penley's offer of proof, Wilson testified

7. The Texas Rules of Criminal Evidence were in effect at the time of trial, but have since been superseded by the Rules of Evidence, which became effective on March 1, 1998.

8. Green v. State, 934 S.W.2d 92, 101–02 (Tex. Crim.App.1996).

9. Id. at 102.

10. See Norman v. State, 523 S.W.2d 669, 671 (Tex.Crim.App.1975).

11. See Basham v. State, 608 S.W.2d 677, 679 (Tex.Crim.App. [Panel Op.] 1980).

12. TEX.R.CRIM. EVID. 407(a) (Vernon 1997) (now TEX.R. EVID. 407(a)).

13. 1 STEVEN GOODE ET AL, TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 407.1 (2d ed.1993).

14. 2 WIENSTEIN'S FED. EVID.2d § 407.03[1] (Matthew Bender & Co. ed., 1998).

15. Id. at § 407.03[2].

that the policy change was a safety measure, a precautionary measure, and was, from her understanding, not something that would improve the reliability of the evidence.

For the evidence to be excludable under Rule 407, the remedial action must meet three requirements: (1) the measure must have been taken subsequent to the event, (2) in response to the event, and (3) by a party to the proceeding.[16] In the instant case, the policy change took place after Penley's first trial and in response to Dr. Lowry's testimony during that trial. The policy change made the event less likely to occur, i.e., the policy change made it less likely an expert would attack the reliability of the blood evidence for lack of refrigeration, and the change was made by a party to the suit, the State. Therefore, the policy change here meets the requirements for exclusion under the rule.

Dr. William Rohr, the medical examiner for Collin County, testified that it is important in some instances to refrigerate a blood sample.

> [S]ome of the reasons [are] that sometimes some of the blood tubes that come in do not have any preservative in the tubes, therefore, you need to immediately refrigerate those samples because if you do not, those tubes, the blood in there could deteriorate. Deterioration. It could be putrefied. It could coagulate. So you would need to take precautions on those types of samples.

Dr. Rohr testified that putrefaction is the growth of bacteria in the blood.

Evans testified that he has tested thousands of samples of blood over a period of seventeen years and Penley's blood sample did not appear to be contaminated in any way. Blood can be contaminated if it is putrefied or coagulated.

Penley's blood was stored in a "gray-top tube" or gray-top Vacutainer. Dr. Rohr testified that gray-top tubes contain an anticoagulant and a chemical preservative to inhibit bacterial growth. When asked whether there would be any problem with blood that was stored in a gray-top tube for eighteen days at room temperature, Dr. Rohr testified that there would not be any problem with the blood and that there would be no growth of alcohol in the blood during that time. Officer Dawson testified that he mixed Penley's blood with the anticoagulant, a white powdery substance in the bottom of the vial.

■ Penley contends that Wilson controverted the feasibility of the precautionary measures in her testimony during the offer of proof, and because she did so, evidence of the subsequent remedial measures was admissible. Rule 407(a) allows the admission of remedial measures if the party's opponent has undertaken to controvert the feasibility of precautionary measures. Reviewing Wilson's testimony, we find that it does not demonstrate that refrigeration is unfeasible or impracticable, nor does Wilson contend that taking the evidence to the D.P.S. laboratory on a more frequent basis is unfeasible or impracticable.[17]

■ Next, Penley contends that the Plano Police Department is a third party and, therefore, evidence on the policy changes is admissible against the State because it was the police department and not the State that made the policy changes. Penley directs our attention to Rule 407 of the Federal Rules[18] and case law interpreting it which holds that federal Rule 407 does not exclude evidence of subsequent remedial measures made by a third party, because the policy behind the rule is not served in such instances. Contrary to Penley's assertion, the Plano Po-

---

16. See Wendy Hunkele, *Admissibility of Subsequent Remedial Measures as Evidence in Texas*, 20 ST. MARY'S L.J. 121, 122–23 (1988).

17. See, e.g., *Brookshire Bros., Inc. v. Lewis*, 911 S.W.2d 791, 796 (Tex.App.-Tyler 1995, writ denied).

18. FED.R.EVID. 407.

lice Department is not a third party, but is an arm of the State and as such it is a party to the action.[19]

The policy changes were being offered to show that the police department was negligent in its handling of the blood and that its negligence made the subsequent testing and results of the testing unreliable. This is the type of evidence the rule was meant to cover. Further, the evidence reflects that the blood was not contaminated, nor were the results unreliable. Wilson testified that the measure was precautionary in nature, which is the policy behind the rule. Penley did not present an expert witness to refute the reliability of the blood evidence. The trial court did not abuse its discretion when it excluded the evidence of this subsequent remedial measure. Because the trial court correctly ruled the evidence was inadmissible, we do not reach Penley's arguments that he was deprived of his Texas and federal rights of confrontation and cross-examination of the State's witnesses, Wilson and Collins. These points of error are overruled.

The discussion of the remaining points of error do not meet the criteria for publication, thus we order that they not be published. Tex.R.App. P. 47.3 & 47.4.

The judgment is affirmed.

---

**19.** *See State v. Hernandez,* 842 S.W.2d 306, 316 (Tex.App.-San Antonio 1992, pet. ref'd) *on remand,* 894 S.W.2d 807 (Tex.App.-San Antonio 1994, pet. ref'd); *Smith v. State,* 828 S.W.2d 495, 496 (Tex.App.-El Paso 1992, no pet.); *Young v. State,* 820 S.W.2d 180, 189 (Tex.App.-Dallas 1991, pet. ref'd); *see also Michigan v. Jackson,* 475 U.S. 625, 634, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).