Opinion filed January 29, 2010











 
 
  
 
 







 
 
  
 
 




Opinion filed January 29,
2010

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                  ___________

 

                                                          No. 11-08-00088-CV 

                                                     __________

 

                                        COLIN
POWERS, Appellant

 

                                                             V.

 

                    TEXAS
MUTUAL INSURANCE COMPANY, Appellee

 



 

                                          On
Appeal from the 70th District Court

 

                                                           
Ector County, Texas

 

                                                 Trial
Court Cause No. A-119570

 



 

                                             M E M O R A
N D U M   O P I N I O N

 








This
is a workers=
compensation case.  Under Section 406.032 of the Texas Workers= Compensation Act,[1]
an insurance carrier is not liable for compensation if the injury occurred
while the employee was in a state of intoxication.  Section 406.032(1)(A). 
Texas Mutual Insurance Company relied on the intoxication provision to deny
compensation, but lost at the administrative level.  Texas Mutual then filed
this suit in the district court to overturn that decision.  The jury found that
appellant, Colin Powers, was intoxicated when he wrecked his vehicle, and the
trial court entered judgment for Texas Mutual.  The three points of error of
Powers are based on a contention that there was a fatal gap in the chain of
custody of the blood sample drawn at the hospital.  Specifically, the contention
is that Texas Mutual did not prove that it was a blood sample taken from Powers
at the hospital.  We affirm.

AIntoxication@ Defined

Because
Texas Mutual was the party appealing the Texas Workers= Compensation Commission=s ruling, it had the burden
of proof by a preponderance of the evidence that Powers was intoxicated when he
was injured.  Section 410.303.  Section 401.013 defines  Aintoxication@ as Ahaving an alcohol concentration [of 0.08 or
more]@ or Anot having the normal use
of mental or physical faculties resulting from the voluntary introduction@ of Aan alcoholic beverage.@  Section 401.013(a)(1), (2).  The
definition is substantially the same as the one found in Tex. Penal Code Ann. ' 49.01 (Vernon 2003) for
intoxication and alcoholic beverage offenses.  Thus, criminal cases involving
gaps in the chain of custody are instructive.

Background
Facts

Colin
Powers worked for Safety International, implementing safety programs for
drilling rigs.  For several months, he had been setting up a safety program for
one of Safety International=s
customers.  On the night of his accident, he had been on the rig for eight days
and was leaving the rig to return to his home in Odessa.  Leaving with him was
another Safety International employee, Nolberto ASonny@ Martinez Jr., who had gone
to the rig that day to help Powers; Powers was Martinez=s supervisor.  They left the rig between 8:00
p.m and 8:30 p.m. on the night of April 10, 2003, and stopped in Sonora at a
Mexican restaurant, but it was closed.








Powers
and Martinez then stopped at a bar.  According to their testimony, they each
drank one beer there and then went to a second bar.  Martinez testified that he
drank two beers at the second bar.  He did not know how many beers that Powers
consumed because Powers was on the telephone for nearly an hour visiting with a
vice-president of his company concerning the possibility of their being needed
at another drilling rig to rig the equipment down.  According to Powers, they
stayed at the second bar for about two hours because he knew that they would
not be needed at the second drilling rig until after midnight.

Before
leaving Sonora, they stopped at a Town and Country store where Powers purchased
two burritos.  Powers said that Martinez purchased a 12-pack of Bud Light beer
to take home because Martinez lived in a dry county.  When they drove by the
second drilling rig, Powers saw that the rig was not ready for them to rig down
the equipment; consequently, he and Martinez did not stop at the rig.

Martinez
testified that they bought the 12-pack of beer because they knew it would be
after midnight when they arrived home in Odessa.  At trial, he maintained that
neither one of them drank any of the beer while they were driving.  However,
Martinez said that the decision to stop at the Town and Country store to buy
beer was a joint decision; they put their money together to buy the beer.  On
cross-examination, counsel for Texas Mutual read from Texas Department of
Public Safety Trooper Kris Padgitt=s
testimony and asked Martinez if he remembered making the following statement to
Trooper Padgitt:

I asked the
passenger, Mr. Martinez, if they had been drinking, and he said that they had. 
He advised that they had stopped and bought a 12-pack of beer in Sonora, Texas,
and that they had been drinking that 12-pack of beer while they were on their
way to Odessa, which is where they were headed at the time.

 

Martinez
testified that he did not remember making that statement to Trooper Padgitt. 
Martinez also did not remember making a statement to their boss, Mark Graves,
that Powers had asked for a beer between Ozona and Rankin; Graves had written
that statement down in his notes about the accident.

In
describing the accident, Martinez said that he felt the vehicle vibrate as they
went around a curve, that he looked up and yelled at Powers, and that Powers
overcorrected.  The vehicle rolled and ended up lying on its side.  Martinez
had to break the windshield to get out.  Powers was hanging from the seat belt,
and it was some time before Martinez could get help to get Powers out of the
truck.  Powers told the jury that he is now a quadriplegic.








 Powers
was first taken to the Rankin County Hospital.  Martinez said that he heard an
officer tell the doctor, Dr. Nigel daSilva, that he needed a blood sample from
Powers, but the doctor told the officer that he would have to wait because they
needed to tend to Powers first.  Martinez also said that he did not see the
officer get a blood sample; he did not know whether a sample was taken or not. 
Martinez had his hand treated after Powers left for San Angelo on a
helicopter.  Martinez was driven to the hospital in Odessa by the president of
Safety International, Graves, where he received further treatment.

Although
describing the scene at the hospital as being Apretty
chaotic,@ Martinez
testified at trial that there were just the two of them B he and Powers B
in the emergency room.  He stated that a urinalysis was taken to see if there
was blood in his urine, but no alcohol test was run on him.  Because only the
two of them were being treated in the emergency room, Martinez acknowledged
that there was no one else from whom a blood sample could be taken.

At
the time of the accident in 2003, Juan Jimenez was a deputy sheriff with the
Upton County Sheriff=s
Department.  He assisted Trooper Padgitt in responding to the accident.  They
noted that there were a lot of Bud Light beer bottles, both open and closed,
inside the vehicle and on the ground.  Based on their observations and the
smell of alcohol on Powers, Trooper Padgitt asked Deputy Jimenez to follow
the ambulance and collect a blood sample from Powers at the hospital.  Trooper
Padgitt gave Deputy Jimenez a blood sample tube inside a container and put down
in his accident report that alcohol was a factor in the accident.  Trooper
Padgitt testified that he was still at the accident scene when Deputy Jimenez
brought the sample back from Rankin County Hospital.  The sample remained in
Trooper Padgitt=s
possession until he turned it over to the DPS lab in Midland.

Deputy
Jimenez identified the blood sample tube that was given to him by Trooper
Padgitt and stated that it was the one used to contain the blood sample from
Powers.  He identified a smudged signature on the tube as being his signature
and noted the name of ARankin
Hospital@ underneath
the smudged signature.  Deputy Jimenez said that he told Dr. daSilva that he
needed a blood sample from Powers before Powers was taken to another hospital. 
Dr. daSilva walked back into the X-ray room, withdrew the blood from Powers=s right arm, and then
handed the vial back to Deputy Jimenez.  Deputy Jimenez unequivocally stated
that he saw Dr. daSilva take the blood sample from Powers.  He also identified
the chain-of-custody evidence card that he filled out.  It was noted on the
card where the blood sample was taken and that it was taken by Dr. daSilva. 
Deputy Jimenez testified that he did not ask Dr. daSilva to sign the sample
because the doctor was too busy treating Powers.








After
Powers was airlifted from Rankin County Hospital, Deputy Jimenez went back to
the accident site.  He related that, after he collected the blood sample, he
put it in a cardboard canister and then handed it to Trooper Padgitt when he
returned to the accident site.  Trooper Padgitt delivered the blood sample to
the DPS lab.

Powers
has not challenged actions by the Department of Public Safety lab and how it
performed its analysis of the blood sample.  Dr. Andrew Nelson Avery, employed
at the University of Texas Medical Branch in Galveston and board certified in
medical toxicology, testified that he had reviewed the medical records and DPS
records in this case.  He stated that Powers=s
blood sample contained .20 grams of alcohol per hundred milliliters of blood,
significantly higher than the .08 legal definition of intoxication in Texas. 
Dr. Avery was thoroughly questioned about the chain of custody, and he
expressed his opinion that the chain of custody was reliable in this case.  The
test report was then marked as Exhibit No. 1 and introduced into evidence. 
Powers=s attorney
stated that he had no objection to the introduction of Exhibit No. 1.

Dennis
Hambrick, a chemist with the DPS in Midland, testified that he performed the
blood test reflected in Exhibit No. 1.  Trooper Padgitt testified that Hambrick
reported in a letter that the results of his analysis showed that the blood
sample contained .20 grams of alcohol per 100 milliliters.  Hambrick was
thoroughly cross-examined about missing information in the paperwork
accompanying the blood sample tube.  He explained that he was talking about
information on the square box that contained the blood sample tube delivered by
Trooper Padgitt.  According to Hambrick, there should have been an evidence
tape with the trooper=s
initials across the seal on the box.  In his letter to Danny Gentry of Texas
Mutual, however, Hambrick expressly noted that A[t]he
actual blood tube was taped and sealed properly.@








Before
the trial in October 2007, Powers filed a motion in which he contended that
there was a Agap@ in the chain of custody: 
lack of documentation by Deputy Jimenez and the possibility that the sample was
not from Powers.  A hearing on his motion to exclude the blood alcohol test
results was held in August 2007.  Deputy Jimenez testified at the hearing that
Trooper Padgitt instructed him to get a blood sample; that he traveled to the
Rankin County Hospital emergency room where Powers was taken; that he asked Dr.
daSilva to take the blood sample; that he watched Dr. daSilva take the blood
sample while Powers was on the X-ray table; and that he sealed the tube, wrote
his initials on it, and documented it as evidence.  He then returned to the
accident site and handed the sample to Trooper Padgitt.  The trial court
overruled the motion of Powers and ruled that the blood sample evidence was
admissible.

Standard
of Review

Powers=s challenge on appeal is
that the blood alcohol test results should not have been admitted as evidence
because there were gaps in the chain of custody; therefore, the expert opinions
of Dr. Avery and Hambrick that relied on the blood sample should have been
excluded.  Powers cites Gammill v. Jack Williams Chevrolet, Inc., 972
S.W.2d 713, 726 (Tex. 1998), for the proposition that expert testimony is
unreliable if Athere
is simply too great an analytical gap between the data and the opinion
proffered.@ The part
of his argument that relies on Gammill commits the fallacy of ambiguity
(equivocation).  The Agap@ referred to in Gammill
is one of analytical reasoning.  The Agap@ challenged here is whether
the chain of custody from the time the blood sample was taken until it was
analyzed by Hambrick was established by the evidence; it was not a Agap@ in an expert=s
analytical reasoning.

Chain-of-custody
challenges such as the one here depend on the credibility of the witnesses. 
Texas civil and criminal cases hold that, to the extent that there are any gaps
in the chain of custody, they go to the weight of the evidence rather than to
its admissibility.  Missouri-Kansas-Texas R.R. Co. v. May, 600
S.W.2d 755, 756 (Tex. 1980); Avila v. State, 18 S.W.3d 736, 739 (Tex.
App.CSan Antonio
2000, no pet.); Penley v. State, 2 S.W.3d 534, 537 (Tex. App.CTexarkana 1999, pet. ref=d); March v.
Victoria Lloyds Ins. Co., 773 S.W.2d 785, 788 (Tex. App.CFort Worth 1989, writ
denied).








A
trial court rules on the admission of expert testimony and evidence under an
abuse of discretion.  Paschal v. Great W. Drilling, Ltd., 215 S.W.3d
437, 445 (Tex. App.CEastland
2006, pet. denied).  At the pretrial hearing, the trial court was the judge of
the credibility of the witnesses and resolved conflicting testimony.  Keith
v. Solls, 256 S.W.3d 912, 919 (Tex. App.CDallas
2008, no pet.).  During the trial B
from voir dire to final argument B
Powers made it clear to the jury that he was challenging the chain of custody
of the blood sample that Hambrick tested.  Again, the chain-of- custody
evidence depended on the credibility of the witnesses, especially that of
Deputy Jimenez.  The jurors were the sole judges of the credibility of the
witnesses and the weight given to their testimony.  City of Keller v. Wilson,
168 S.W.3d 802, 819 (Tex. 2005).  In view of their verdict that Powers was
intoxicated, the jurors concluded that the chain of custody was established by
a preponderance of the evidence.[2]

Analysis

There
are two reasons why Powers=s
arguments concerning the chain of custody of the blood sample are rejected. 
First, Powers waived these challenges by not making these objections at trial. 
Second, even if he had made the objections, the evidence at trial was
sufficient to establish the chain of custody.

At
the end of the pretrial hearing, Powers stated to the trial court that Athe one gap that was
missing at the [Texas Workers=
Compensation] Commission@
was the testimony by Deputy Jimenez that he watched Dr. daSilva obtain the
blood sample from Powers and that he sealed the tube and delivered it to
Trooper Padgitt.  Although he did not withdraw the motion, Powers=s attorney represented to
the trial court that he did not think that his motion had a great deal of
merit.

To
preserve error for review, a litigant must object and state the grounds for the
ruling sought from the trial court with sufficient specificity to make the
court aware of the complaint.  Tex. R.
App. P. 33.1(a)(1)(A).  When Texas Mutual offered Powers=s blood alcohol test
results into evidence, Powers=s
attorney stated that he had Ano
objection.@  When a
party affirmatively asserts during trial that he or she has Ano objection@ to the admission of the
complained-of evidence, any error in the admission of the evidence is waived,
even in the face of a pretrial ruling.  Walker v. Lampman,
No. 10-06-00096-CV, 2007 WL 2276195, at *4 (Tex. App.CWaco Aug. 8, 2007, pet.
denied) (mem. op.); Tex. Dep=t
of Transp. v. Pate, 170 S.W.3d 840, 850 (Tex. App.CTexarkana 2005, pet. denied).  In addition,
Powers did not object to references by Dr. Avery, Hambrick, and Trooper Padgitt
to the blood alcohol test result of .20 grams of alcohol per 100 milliliters.

Even
if Powers had objected to the introduction of the blood sample into evidence,
that objection would not have been successful.  The evidence was sufficient for
the factfinder to conclude that there was a reliable chain of custody with no
gaps.








Powers
points to an affidavit by Deputy Jimenez in which he states that he observed
Dr. daSilva draw blood from Powers Ain
the emergency room.@ 
At the hearing the next day, Deputy Jimenez testified that he saw Dr.
daSilva draw the blood Ain
the [X]-ray room.@ 
Both at the pretrial hearing and at trial, Deputy Jimenez testified that he saw
Dr. daSilva take the sample of blood from Powers while Powers was on the X-ray
table, that Dr. daSilva took the sample from Powers=s right arm, and that Dr. daSilva then handed
the sample to Deputy Jimenez.  The suggested conflict was resolved by the trial
court and the jury.

Powers
points out that, at the hearing, Deputy Jimenez testified that there were Atwo patients being treated@ but that, at trial, he was
asked, AThere was no
one else in [the] emergency room being treated?@ 
Deputy Jimenez answered, ANo,
sir.@  We note that
Martinez testified at trial that the two of them B
Martinez and Powers B
were the only patients being treated in the emergency room.  It is by no means
clear that there was a conflict in Deputy Jimenez=s
testimony.  The question and Deputy Jimenez=s
answer referred to the emergency room.  At both the hearing and at trial,
Deputy Jimenez testified that Powers was taken first to the emergency room
and then to the X-ray room where Deputy Jimenez observed the doctor take the
blood sample.  From Martinez=s
testimony, we know that there was no one else there as a patient from whom a
blood sample could be taken.

Powers
states in his brief that, A[e]ven
though the officer=s
name is the only thing smudged[,] it is clear that it was someone=s signature, but not
Jimenez=s.@  We cannot verify that
statement from the record.  More importantly, Deputy Jimenez testified that it
was his signature, but he did not know how it became smudged.

Powers
points to a statement by Dr. daSilva that technicians draw blood but that he
never draws blood.  Although he made that statement at a later point in his
deposition, it is clear from the record that Dr. daSilva did not unequivocally
testify that he did not draw a blood sample from Powers.  Instead, he repeated
many times during his deposition that he could not recall whether he drew the
blood sample from Powers because he did not pay attention to anyone else while
treating Powers.  His deposition was taken four years after the accident, and
Dr. daSilva=s main
memory was that his entire focus was getting Powers to a neurosurgeon quickly. 
Dr. daSilva also testified that he did smell alcohol on Powers=s breath and noted it in
his records.








Powers
has pointed to other possible conflicts in the evidence, but they also involved
the credibility of the witnesses and the weight given to their testimony.  The
trial court and the jury judged the credibility of the witnesses and resolved
any conflicts.  City of Keller, 168 S.W.3d at 819.

There
was sufficient legal and factual evidence to support the jury=s finding that Powers was
intoxicated at the time of his accident.  The trial court correctly ruled that
the blood sample from Powers and its results were admissible as evidence.  His
three points of error are overruled.

This
Court=s Ruling

The
judgment of the trial court is affirmed.

 

 

TERRY McCALL

JUSTICE

 

January 29, 2010

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]The Texas Workers=
Compensation Act is found in Tex. Lab.
Code Ann. '' 401.001-419.007 (Vernon 2006 & Supp. 2009).





[2]The jury answered, AYes,@ to Question No. 1: ADo you find from a preponderance of the evidence that Colin Powers was
intoxicated on the day of his injury?@ 
Under the question, the charge defined A[i]ntoxication@ only in terms of Ahaving
an alcohol concentration of 0.08 or more.@ 
The alternative definition of Aintoxication@ was not included.  We assume that the jury followed
the charge instruction.  Of course, the additional evidence of intoxication
supported a conclusion that the blood sample was from Powers.