**Opinion filed January 29, 2010**



**In The**

# Eleventh Court of Appeals

_____

**No. 11-08-00088-CV**

_____

**COLIN POWERS, Appellant**

**V.**

**TEXAS MUTUAL INSURANCE COMPANY, Appellee**

**On Appeal from the 70th District Court**

**Ector County, Texas**

**Trial Court Cause No. A-119570**

**M E M O R A N D U M   O P I N I O N**

This is a workers' compensation case. Under Section 406.032 of the Texas Workers' Compensation Act,[1] an insurance carrier is not liable for compensation if the injury occurred while the employee was in a state of intoxication. Section 406.032(1)(A). Texas Mutual Insurance Company relied on the intoxication provision to deny compensation, but lost at the administrative

---

[1]The Texas Workers' Compensation Act is found in TEX. LAB. CODE ANN. §§ 401.001-419.007 (Vernon 2006 & Supp. 2009).

level. Texas Mutual then filed this suit in the district court to overturn that decision. The jury found that appellant, Colin Powers, was intoxicated when he wrecked his vehicle, and the trial court entered judgment for Texas Mutual. The three points of error of Powers are based on a contention that there was a fatal gap in the chain of custody of the blood sample drawn at the hospital. Specifically, the contention is that Texas Mutual did not prove that it was a blood sample taken from Powers at the hospital. We affirm.

## *"Intoxication" Defined*

Because Texas Mutual was the party appealing the Texas Workers' Compensation Commission's ruling, it had the burden of proof by a preponderance of the evidence that Powers was intoxicated when he was injured. Section 410.303. Section 401.013 defines "intoxication" as "having an alcohol concentration [of 0.08 or more]" or "not having the normal use of mental or physical faculties resulting from the voluntary introduction" of "an alcoholic beverage." Section 401.013(a)(1), (2). The definition is substantially the same as the one found in TEX. PENAL CODE ANN. § 49.01 (Vernon 2003) for intoxication and alcoholic beverage offenses. Thus, criminal cases involving gaps in the chain of custody are instructive.

## *Background Facts*

Colin Powers worked for Safety International, implementing safety programs for drilling rigs. For several months, he had been setting up a safety program for one of Safety International's customers. On the night of his accident, he had been on the rig for eight days and was leaving the rig to return to his home in Odessa. Leaving with him was another Safety International employee, Nolberto "Sonny" Martinez Jr., who had gone to the rig that day to help Powers; Powers was Martinez's supervisor. They left the rig between 8:00 p.m and 8:30 p.m. on the night of April 10, 2003, and stopped in Sonora at a Mexican restaurant, but it was closed.

Powers and Martinez then stopped at a bar. According to their testimony, they each drank one beer there and then went to a second bar. Martinez testified that he drank two beers at the second bar. He did not know how many beers that Powers consumed because Powers was on the telephone for nearly an hour visiting with a vice-president of his company concerning the possibility of their being needed at another drilling rig to rig the equipment down. According to Powers, they stayed at the

2

second bar for about two hours because he knew that they would not be needed at the second drilling rig until after midnight.

Before leaving Sonora, they stopped at a Town and Country store where Powers purchased two burritos. Powers said that Martinez purchased a 12-pack of Bud Light beer to take home because Martinez lived in a dry county. When they drove by the second drilling rig, Powers saw that the rig was not ready for them to rig down the equipment; consequently, he and Martinez did not stop at the rig.

Martinez testified that they bought the 12-pack of beer because they knew it would be after midnight when they arrived home in Odessa. At trial, he maintained that neither one of them drank any of the beer while they were driving. However, Martinez said that the decision to stop at the Town and Country store to buy beer was a joint decision; they put their money together to buy the beer. On cross-examination, counsel for Texas Mutual read from Texas Department of Public Safety Trooper Kris Padgitt's testimony and asked Martinez if he remembered making the following statement to Trooper Padgitt:

> I asked the passenger, Mr. Martinez, if they had been drinking, and he said that they had. He advised that they had stopped and bought a 12-pack of beer in Sonora, Texas, and that they had been drinking that 12-pack of beer while they were on their way to Odessa, which is where they were headed at the time.

Martinez testified that he did not remember making that statement to Trooper Padgitt. Martinez also did not remember making a statement to their boss, Mark Graves, that Powers had asked for a beer between Ozona and Rankin; Graves had written that statement down in his notes about the accident.

In describing the accident, Martinez said that he felt the vehicle vibrate as they went around a curve, that he looked up and yelled at Powers, and that Powers overcorrected. The vehicle rolled and ended up lying on its side. Martinez had to break the windshield to get out. Powers was hanging from the seat belt, and it was some time before Martinez could get help to get Powers out of the truck. Powers told the jury that he is now a quadriplegic.

Powers was first taken to the Rankin County Hospital. Martinez said that he heard an officer tell the doctor, Dr. Nigel daSilva, that he needed a blood sample from Powers, but the doctor told the officer that he would have to wait because they needed to tend to Powers first. Martinez also said that he did not see the officer get a blood sample; he did not know whether a sample was taken or not.

3

Martinez had his hand treated after Powers left for San Angelo on a helicopter. Martinez was driven to the hospital in Odessa by the president of Safety International, Graves, where he received further treatment.

Although describing the scene at the hospital as being "pretty chaotic," Martinez testified at trial that there were just the two of them – he and Powers – in the emergency room. He stated that a urinalysis was taken to see if there was blood in his urine, but no alcohol test was run on him. Because only the two of them were being treated in the emergency room, Martinez acknowledged that there was no one else from whom a blood sample could be taken.

At the time of the accident in 2003, Juan Jimenez was a deputy sheriff with the Upton County Sheriff's Department. He assisted Trooper Padgitt in responding to the accident. They noted that there were a lot of Bud Light beer bottles, both open and closed, inside the vehicle and on the ground. Based on their observations and the smell of alcohol on Powers, Trooper Padgitt asked Deputy Jimenez to follow the ambulance and collect a blood sample from Powers at the hospital. Trooper Padgitt gave Deputy Jimenez a blood sample tube inside a container and put down in his accident report that alcohol was a factor in the accident. Trooper Padgitt testified that he was still at the accident scene when Deputy Jimenez brought the sample back from Rankin County Hospital. The sample remained in Trooper Padgitt's possession until he turned it over to the DPS lab in Midland.

Deputy Jimenez identified the blood sample tube that was given to him by Trooper Padgitt and stated that it was the one used to contain the blood sample from Powers. He identified a smudged signature on the tube as being his signature and noted the name of "Rankin Hospital" underneath the smudged signature. Deputy Jimenez said that he told Dr. daSilva that he needed a blood sample from Powers before Powers was taken to another hospital. Dr. daSilva walked back into the X-ray room, withdrew the blood from Powers's right arm, and then handed the vial back to Deputy Jimenez. Deputy Jimenez unequivocally stated that he saw Dr. daSilva take the blood sample from Powers. He also identified the chain-of-custody evidence card that he filled out. It was noted on the card where the blood sample was taken and that it was taken by Dr. daSilva. Deputy Jimenez testified that he did not ask Dr. daSilva to sign the sample because the doctor was too busy treating Powers.

After Powers was airlifted from Rankin County Hospital, Deputy Jimenez went back to the accident site. He related that, after he collected the blood sample, he put it in a cardboard canister and

4

then handed it to Trooper Padgitt when he returned to the accident site. Trooper Padgitt delivered the blood sample to the DPS lab.

Powers has not challenged actions by the Department of Public Safety lab and how it performed its analysis of the blood sample. Dr. Andrew Nelson Avery, employed at the University of Texas Medical Branch in Galveston and board certified in medical toxicology, testified that he had reviewed the medical records and DPS records in this case. He stated that Powers's blood sample contained .20 grams of alcohol per hundred milliliters of blood, significantly higher than the .08 legal definition of intoxication in Texas. Dr. Avery was thoroughly questioned about the chain of custody, and he expressed his opinion that the chain of custody was reliable in this case. The test report was then marked as Exhibit No. 1 and introduced into evidence. Powers's attorney stated that he had no objection to the introduction of Exhibit No. 1.

Dennis Hambrick, a chemist with the DPS in Midland, testified that he performed the blood test reflected in Exhibit No. 1. Trooper Padgitt testified that Hambrick reported in a letter that the results of his analysis showed that the blood sample contained .20 grams of alcohol per 100 milliliters. Hambrick was thoroughly cross-examined about missing information in the paperwork accompanying the blood sample tube. He explained that he was talking about information on the square box that contained the blood sample tube delivered by Trooper Padgitt. According to Hambrick, there should have been an evidence tape with the trooper's initials across the seal on the box. In his letter to Danny Gentry of Texas Mutual, however, Hambrick expressly noted that "[t]he actual blood tube was taped and sealed properly."

Before the trial in October 2007, Powers filed a motion in which he contended that there was a "gap" in the chain of custody: lack of documentation by Deputy Jimenez and the possibility that the sample was not from Powers. A hearing on his motion to exclude the blood alcohol test results was held in August 2007. Deputy Jimenez testified at the hearing that Trooper Padgitt instructed him to get a blood sample; that he traveled to the Rankin County Hospital emergency room where Powers was taken; that he asked Dr. daSilva to take the blood sample; that he watched Dr. daSilva take the blood sample while Powers was on the X-ray table; and that he sealed the tube, wrote his initials on it, and documented it as evidence. He then returned to the accident site and handed the sample to

Trooper Padgitt. The trial court overruled the motion of Powers and ruled that the blood sample evidence was admissible.

*Standard of Review*

Powers's challenge on appeal is that the blood alcohol test results should not have been admitted as evidence because there were gaps in the chain of custody; therefore, the expert opinions of Dr. Avery and Hambrick that relied on the blood sample should have been excluded. Powers cites *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998), for the proposition that expert testimony is unreliable if "there is simply too great an analytical gap between the data and the opinion proffered." The part of his argument that relies on *Gammill* commits the fallacy of ambiguity (equivocation). The "gap" referred to in *Gammill* is one of analytical reasoning. The "gap" challenged here is whether the chain of custody from the time the blood sample was taken until it was analyzed by Hambrick was established by the evidence; it was not a "gap" in an expert's analytical reasoning.

Chain-of-custody challenges such as the one here depend on the credibility of the witnesses. Texas civil and criminal cases hold that, to the extent that there are any gaps in the chain of custody, they go to the weight of the evidence rather than to its admissibility. *Missouri-Kansas-Texas R.R. Co. v. May*, 600 S.W.2d 755, 756 (Tex. 1980); *Avila v. State*, 18 S.W.3d 736, 739 (Tex. App.—San Antonio 2000, no pet.); *Penley v. State*, 2 S.W.3d 534, 537 (Tex. App.—Texarkana 1999, pet. ref'd); *March v. Victoria Lloyds Ins. Co.*, 773 S.W.2d 785, 788 (Tex. App.—Fort Worth 1989, writ denied).

A trial court rules on the admission of expert testimony and evidence under an abuse of discretion. *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 445 (Tex. App.—Eastland 2006, pet. denied). At the pretrial hearing, the trial court was the judge of the credibility of the witnesses and resolved conflicting testimony. *Keith v. Solls*, 256 S.W.3d 912, 919 (Tex. App.—Dallas 2008, no pet.). During the trial – from voir dire to final argument – Powers made it clear to the jury that he was challenging the chain of custody of the blood sample that Hambrick tested. Again, the chain-of-custody evidence depended on the credibility of the witnesses, especially that of Deputy Jimenez. The jurors were the sole judges of the credibility of the witnesses and the weight given to their testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). In view of their verdict that Powers was

intoxicated, the jurors concluded that the chain of custody was established by a preponderance of the evidence.[2]

*Analysis*

There are two reasons why Powers's arguments concerning the chain of custody of the blood sample are rejected. First, Powers waived these challenges by not making these objections at trial. Second, even if he had made the objections, the evidence at trial was sufficient to establish the chain of custody.

At the end of the pretrial hearing, Powers stated to the trial court that "the one gap that was missing at the [Texas Workers' Compensation] Commission" was the testimony by Deputy Jimenez that he watched Dr. daSilva obtain the blood sample from Powers and that he sealed the tube and delivered it to Trooper Padgitt. Although he did not withdraw the motion, Powers's attorney represented to the trial court that he did not think that his motion had a great deal of merit.

To preserve error for review, a litigant must object and state the grounds for the ruling sought from the trial court with sufficient specificity to make the court aware of the complaint. Tᴇx. R. Aᴘᴘ. P. 33.1(a)(1)(A). When Texas Mutual offered Powers's blood alcohol test results into evidence, Powers's attorney stated that he had "no objection." When a party affirmatively asserts during trial that he or she has "no objection" to the admission of the complained-of evidence, any error in the admission of the evidence is waived, even in the face of a pretrial ruling. *Walker v. Lampman*, No. 10-06-00096-CV, 2007 WL 2276195, at *4 (Tex. App.—Waco Aug. 8, 2007, pet. denied) (mem. op.); *Tex. Dep't of Transp. v. Pate*, 170 S.W.3d 840, 850 (Tex. App.—Texarkana 2005, pet. denied). In addition, Powers did not object to references by Dr. Avery, Hambrick, and Trooper Padgitt to the blood alcohol test result of .20 grams of alcohol per 100 milliliters.

Even if Powers had objected to the introduction of the blood sample into evidence, that objection would not have been successful. The evidence was sufficient for the factfinder to conclude that there was a reliable chain of custody with no gaps.

---

[2]The jury answered, "Yes," to Question No. 1: "Do you find from a preponderance of the evidence that Colin Powers was intoxicated on the day of his injury?" Under the question, the charge defined "[i]ntoxication" only in terms of "having an alcohol concentration of 0.08 or more." The alternative definition of "intoxication" was not included. We assume that the jury followed the charge instruction. Of course, the additional evidence of intoxication supported a conclusion that the blood sample was from Powers.

7

Powers points to an affidavit by Deputy Jimenez in which he states that he observed Dr. daSilva draw blood from Powers "in the emergency room." At the hearing the next day, Deputy Jimenez testified that he saw Dr. daSilva draw the blood "in the [X]-ray room." Both at the pretrial hearing and at trial, Deputy Jimenez testified that he saw Dr. daSilva take the sample of blood from Powers while Powers was on the X-ray table, that Dr. daSilva took the sample from Powers's right arm, and that Dr. daSilva then handed the sample to Deputy Jimenez. The suggested conflict was resolved by the trial court and the jury.

Powers points out that, at the hearing, Deputy Jimenez testified that there were "two patients being treated" but that, at trial, he was asked, "There was no one else in [the] emergency room being treated?" Deputy Jimenez answered, "No, sir." We note that Martinez testified at trial that the two of them – Martinez and Powers – were the only patients being treated in the emergency room. It is by no means clear that there was a conflict in Deputy Jimenez's testimony. The question and Deputy Jimenez's answer referred to the emergency room. At both the hearing and at trial, Deputy Jimenez testified that Powers was taken first to the emergency room and then to the X-ray room where Deputy Jimenez observed the doctor take the blood sample. From Martinez's testimony, we know that there was no one else there as a patient from whom a blood sample could be taken.

Powers states in his brief that, "[e]ven though the officer's name is the only thing smudged[,] it is clear that it was someone's signature, but not Jimenez's." We cannot verify that statement from the record. More importantly, Deputy Jimenez testified that it was his signature, but he did not know how it became smudged.

Powers points to a statement by Dr. daSilva that technicians draw blood but that he never draws blood. Although he made that statement at a later point in his deposition, it is clear from the record that Dr. daSilva did not unequivocally testify that he did not draw a blood sample from Powers. Instead, he repeated many times during his deposition that he could not recall whether he drew the blood sample from Powers because he did not pay attention to anyone else while treating Powers. His deposition was taken four years after the accident, and Dr. daSilva's main memory was that his entire focus was getting Powers to a neurosurgeon quickly. Dr. daSilva also testified that he did smell alcohol on Powers's breath and noted it in his records.

8

Powers has pointed to other possible conflicts in the evidence, but they also involved the credibility of the witnesses and the weight given to their testimony. The trial court and the jury judged the credibility of the witnesses and resolved any conflicts. *City of Keller*, 168 S.W.3d at 819.

There was sufficient legal and factual evidence to support the jury's finding that Powers was intoxicated at the time of his accident. The trial court correctly ruled that the blood sample from Powers and its results were admissible as evidence. His three points of error are overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.

TERRY McCALL

JUSTICE

January 29, 2010

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

9